UNITED STATES *v.* BAXTER ET AL. (No. 1931). UNITED STATES *v.* HOYT (No. 1932).[1]

1. CONSTRUCTION, PARAGRAPHS 647, 648, AND 170, TARIFF ACT OF 1913—RELATIVE SPECIFICITY—LOGS—TIMBER—POLES.

While the free-list provisions of paragraph 647, tariff act of 1913, for "logs, timber, round, unmanufactured," and of paragraph 648 for "cedar * * * in the log, rough, or hewn only" are sufficiently comprehensive to include round cedar timber of any length or diameter, there can be no doubt that the provision of paragraph 170 for telephone, trolley, electric-light, and telegraph poles is more specific.

---

[1] T. D. 37975 (36 Treas. Dec., 303).

2. CONSTRUCTION, PARAGRAPH 170, TARIFF ACT OF 1913—MATERIAL—MANUFACTURE.
   In order to fix classification of merchandise within paragraph 170, tariff act of 1913 ("telephone, trolley, electric-light, and telegraph poles"), it is not necessary to show that it is so far advanced in manufacture as to be devoted to some *one* of the particular uses designated.

3. CONSTRUCTION, PARAGRAPH 170, TARIFF ACT OF 1913—MATERIAL—MANUFACTURE.
   In order that a pole may answer the description of paragraph 170, tariff act of 1913, for telegraph or telephone poles, it is not necessary that it have attached any cross arm, or even that it be notched to receive any. Nor is it necessary that it should be drawshaved, creosoted, squared, or roofed.

4. CONSTRUCTION, PARAGRAPH 170, TARIFF ACT OF 1913—USE—SUSCEPTIBILITY.
   The fact that certain poles may be and are used to some extent as piles is not sufficient to prevent their classification under paragraph 170, tariff act of 1913, as "telephone, trolley, electric-light, and telegraph poles."

5. CONSTRUCTION, PARAGRAPH 170, TARIFF ACT OF 1913—CONGRESSIONAL INTENT.
   The provision of paragraph 170, tariff act of 1913, for "telephone, trolley, electric-light, and telegraph poles" was intended by Congress as a comprehensive one and includes all poles of a character adapted to the uses indicated.

5. CEDAR POLES.
   Cedar poles of a kind shown to be mainly used as "telephone, trolley, electric-light, and telegraph poles" are classifiable accordingly under paragraph 170, tariff act of 1913, notwithstanding that they may be and are used also for other purposes, notwithstanding that, before being used as designated, they are usually drawshaved, painted, notched, squared, creosoted, and roofed, and notwithstanding that they answer also to the call of free-list paragraph 647 for "logs, timber, round, unmanufactured," and that of free-list paragraph 648 for "cedar * * * in the log, rough, or hewn only."

United States Court of Customs Appeals, April 1, 1919.

APPEALS from Board of United States General Appraisers, G. A. 8182 (T. D. 37698).

[Reversed.]

*Bert Hanson,* Assistant Attorney General (*Samuel Isenschmid,* special attorney, of counsel), for the United States.
*Frank Stewart* and *Thos. M. Lane* for appellees in 1931.
     *Lawrence* and *Thos. M. Lane* for appellee in 1932.

[Oral argument Jan. 16, 1919, by Mr. Isenschmid and Mr. Lane.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:
These two cases were heard together in this court. The record is the same in both cases except that in case number 1932 the poles were invoiced as cedar telegraph poles, whereas in the other case they were not specifically so designated. As a matter of fact the merchandise imported consisted either of poles or piles, certain items being invoiced as cedar poles and other items as cedar piles. In these entries, the cedar piles were returned by the appraiser free of duty. The poles were assessed for duty under paragraph 170 of the act of 1913, reading as follows:

Paving posts, railroad ties, and telephone, trolley, electric-light, and telegraph poles of cedar or other woods, 10 per centum ad valorem.

They are claimed to be free of duty under paragraph 647 as "logs, timber, round, unmanufactured," or under paragraph 648 as "cedar * * * in the log, rough, or hewn only * * * or not further advanced than cut into lengths suitable for sticks for umbrellas, parasols, sunshades, whips, fishing rods, or walking canes."

The board held the importations free of duty under paragraph 647.

In the absence of any specific provisions for telephone, trolley, electric-light, and telegraph poles, there would be little difficulty in saying that the provisions of either paragraph 647 or 648 are sufficiently comprehensive to include round timber of any length and dimensions. But there can be no doubt, on the other hand, that the provision for the poles of the character designated is more specific than these broad general terms in the free list. So the case must really turn upon the question of whether these poles as imported fall within the group of poles provided for in paragraph 170.

It was held by the board that the poles were not sufficiently advanced to fix them as devoted to the particular use, and that therefore they had not been brought within paragraph 170. We doubt if it was intended by the board to hold that before a pole could be said to fall within paragraph 170 it must be shown to be devoted to some *one* of the particular uses designated by the paragraph. At any rate, we think such was not a prerequisite to fixing the classification. The record shows that telephone poles and telegraph poles are not distinguishable, and trolley poles and electric-light poles are likewise interchangeable. And perhaps any one of all four of the designated poles—telephone, trolley, electric-light, and telegraph poles—might in some cases be used for any one of the purposes implied by the designation of the paragraph.

So we think in this case the question presented is whether these poles had, when imported (excluding those such as were invoiced and treated as piles) reached such a stage of development that they were appropriately called and treated as either telephone, trolley, electric, light, or telegraph poles within the congressional intent.

A witness was asked the question by the importers' counsel:

Q. If you were to inspect a quantity of poles in the condition in which you import them, could you tell by inspection whether they were to be used as telephone poles, or trolley poles, or electric-light poles, or telegraph poles, or as piles, or as fence posts, or for cribwork, or bridge work?—A. No.

This question indicates that the theory upon which the case was presented was that the particular specific use as between the various uses provided for in the dutiable paragraph must be susceptible of being shown, but the question itself was manifestly unfair, as no one could tell whether a telegraph or telephone pole might or might not be used for a pile, or for being cut up into fence posts, or for the other uses referred to in the question.

The question really is whether the poles imported were suitable for the uses indicated in the paragraph and had been so far advanced as to be devoted to those uses.

As bearing on this question, the invoicing of the poles as telegraph poles is significant. This applies as to only one importer, it is true, but it has a bearing upon the understanding of the trade.

But more than this, the distinction between telegraph poles and piles is significant, as it shows that they are of different dimensions. One of the importers was asked:

Q. Do you buy your poles on specification?—A. Yes, sir.

Q. Do you buy piling on specification?—A. Yes.

Q. Do the same specifications apply to piling as to poles?—A. Yes, in many instances; there are departures from that.

Q. Isn't it a fact that your specifications for piling call for a short pole and a wider pole than the same length pole for other purposes?—A. Usually they do when in lengths short of 30 feet.

Q. Isn't it a fact that in your specifications for piling you provide for a certain length and butt measurement?—A. At times the butt measurement will come the same as cedar poles, and at times the same top measurement.

Q. My question relates to the form of your specifications. Is it not a fact that in furnishing specifications for piling you refer to the length and the butt measurement, whereas in your specifications for poles you refer to the length and the top measurement?—A. The top measurement only; no.

Q. Among other things?—A. Among other things; yes.

The testimony of this same witness further discloses that 80 per cent of the poles which he imports were used for some one of the uses covered by paragraph 170, and that 20 per cent were used for piling. It was also testified that some were used to be cut up in fence posts, and being asked—

Q. Is it more profitable in a fence post?

He replied:

A. Only when we get a rush order for fence posts.

Q. Just an emergency case?—A. Yes.

And when asked, "What lengths do you use for piling purposes," replied:

A. All lengths from 20 up to 45 feet. Some few longer than that; but the average piles will run from 20 to 45 feet.

Q. Do occasions ever arise for bridge or crib work or piling where a still longer pole is required?—A. Very seldom we put a longer cedar pole than that in.

Q. Are those poles known as piles?—A. Yes.

Q. Dealt in as piles?—A. Yes.

Q. Is that term applied to them to a very large extent in the trades?—A. I do not just understand the nature of the question.

Q. Is that term, the term "pilings," applied to them generally in your experience?—A. Yes.

This witness, it is true, further stated in answer to a question by his counsel:

Q. What is the form of a pile? How does it differ from a telephone or telegraph or elect ic-li . pole before the pole has been so finished as to be suited for the uses

mentioned?—A. It differs from a trolley pole or what you would call a cedar pole for carrying trolley lines or other electric lines.

Q. How does it differ?—A. The poles for carrying the electric lines, etc., have to be finished.

Q. I mean before a trolley pole has been put in condition so that it is susceptible of no other use, is it suitable for use as pilings?—A. Yes.

Q. Is that true of electric-light poles?—A. Yes.

Q. And telegraph poles?—A. No; they are too small.

Q. Are not telephone and telegraph poles the same size?—A. Telephone and telegraph poles are usually a smaller size.

It would seem from this testimony that as to the poles which are adapted to telegraph and telephone use, the distinction between them and piles is manifest from the testimony of the importer himself. But more than this, the evidence that they are separately invoiced and that they have different specifications would indicate with sufficient clearness that in the trade they are distinguished.

It is true that some poles are employed to carry high-tension current usable either for power to propel electric railway cars or to be transformed into current for electric light or to furnish power for manufacturing machinery. The former uses may well be said to fall directly within the description as trolley or electric-light wire use. The extent of the latter use as applied to the country at large is not very clearly shown.

The significant fact is, however, that the chief claimed use of poles answering the description and specifications of telegraph poles in any considerable quantities is as piles. Yet as to these, as above seen, the invoices affecting a number of entries show that some poles up to 45 feet in length are invoiced as piles and some as poles. These facts, when taken in connection with the testimony that in ordering piles different specifications are given than those employed in ordering poles for use as telegraph or telephone poles, tends to sustain the contention of the Government that piles as such are a distinct product, and that the use of telephone poles for piles is not only a limited one but is resorted to as a convenience when poles which answer the requirements may be found in a shipment of telegraph and telephone poles. They also tend to show that the witness Baxter, in stating that the percentage sold from his yard for piles was about 20 per cent, may have and probably did include some at least which were invoiced to him as piles and were admitted free as such.

It gets down therefore to the question as to whether these poles were sufficiently advanced at the time they were imported to answer the call of the dutiable paragraph.

The testimony shows that in the case of one of these dealers, after poles are imported they are, before being sold to his customers, drawshaved ready for painting, creosoted at the butt, the butt squared off where irregular, notched for cross arms, and cross arms put in, and the top of the pole sawed so as to produce a peak, a process called "roof-

ing." This, so far as the preparation for painting is concerned, is under a requirement of a municipal ordinance. One of the witnesses for the importers testified:

> The poles are cut to uniform length, roofed on top for shedding moisture, notches cut in them for flying cross arms; knots are smoothed down to surface the pole; the poles are shaved so that the paint will stick to them.
>
> Q. (By General Appraiser WAITE.) That is what you do to your pole?—A. Yes, sir; that is the ordinance; we have to do it.

And he further testified that a great many of these poles are erected in the city of Los Angeles.

This witness further testified that in ordering a telegraph pole, the size of the top and length would be designated, and it would be understood that they would be peeled, if nothing were said, and that the custom is to order a telegraph pole, for instance, 7 inches at the top and 45 feet long, and asked if anything else is to be done to it, he answered, "knotted and peeled."

> Q. That is to say, the knots cut off smooth, with an ax?—A. Usually with an ax.
> Q. Cut them as smooth as you can with an ax; you would never use a drawshave, would you?—A. Never use a drawshave.
> Q. Is that all that is done to them?—A. That is all that is done before shipment.

The testimony further shows in the record that while the telephone poles are treated in the manner above indicated for use in the municipalities, and while the testimony indicates that perhaps a majority of the poles which are sold by Baxter & Co. are so treated, a very considerable, if not an equal number of poles, are sold in the form in which imported, without being notched or otherwise treated.

The witness Baxter testified as follows:

> Q. What is the purpose of roofing the poles?—A. So the water will run off and still preserve it from decay. If the water settles in the top it will decay.
> Q. So shaving and roofing are to preserve?—A. Yes.
> Q. What is the paint for?—A. Also in addition to preserve it.
> Q. And notching, and gaining or scoring, they all refer to one thing?—A. Yes; in order to hold the cross arm.
> Q. Creosoting?—A. To preserve the pole.
> Q. So that with the exception of notching, gaining, or scoring, which refer to the one thing, namely, to hold a cross arm, the other things, namely, shaving, roofing, painting, and creosoting, are for the sole purpose of preserving the pole?—A. Yes; the painting to some extent to make the pole more presentable.
> Q. But the principal purpose of painting is preservation?—A. Yes.
> Q. All these elements of work which are done to the poles after they are imported are economic requirements rather than necessary requirements for use as telephone poles?—A. Yes; I would judge them more economic than necessary. Still I believe they are both.
> Q. There is no one of these requirements, namely, shaving, roofing, painting, or creosoting, which is necessary to make the pole adaptable to use as such?—A. No.

The witness further testified:

> Q. Referring to the notching, gaining, or scoring, which is done for the purpose of holding the cross arm, isn't it a fact that many of these poles are used without cross arms?—A. I think only a small percentage.

Q. But there are some?—A. There are some; yes.

He further testified:

Q. Do I understand you to mean that in all cases except the 25 per cent of your sales which you have just referred to, all this work is done to every other pole which you sell?—A. Yes.

Q.·In other words, in 75·per cent of your sales of poles, the poles are shaved, roofed, painted, notched, and creosoted?—A. I can not say that 75 per cent would have all those things put on them. Probably some of them were not roofed. They would prefer to roof them when they are discharged from the cars.

Q. In other words, you wish your testimony to be understood in this light: That 75 per cent of your sales cover poles which are *either* shaved, or roofed, or painted, or notched, or creosoted, or all, or any?—A. That is right

So, from the testimony of the witness Anderson and the witness Baxter, it would appear that telegraph and telephone poles would be ordered by the designation of the length and the top measurement, and it would be understood that they were peeled and knotted with an ax, without the use of a drawshave, and that that is all that is done before shipment, and that a considerable proportion of them handled by Mr. Baxter's firm without having any of these various processes applied to them are so designated.

Another theory of the importers in this case seems to be that so long as a telegraph pole must, before actually used for stringing telegraph wires, in most instances have cross arms, that it is not a telegraph or telephone pole until such cross arms are provided for or attached. There is testimony indicating that they are sometimes used without cross arms, but we do not deem that material. The point may be illustrated by the following questions and answers of one of the witnesses of the importers:

Q. Are those poles telephone poles?—A. I don't know whether they are telephone or not. They are poles. They use them for telephone, trolley, and others.

Q. Do they use them in the condition that they are taken from the ship?—A. No, sir; they do not.

Q. They put them through some process of manufacture.—A. They can not *install* a pole without cutting it for the cross arms and cutting it in the length to install the line.

While this is doubtless generally true, it does not result that the pole has not reached a state to be known as a telegraph, telephone, or trolley pole. A carpenter can not hang a door until it is fitted to the opening and until there are grooves cut to admit the butts or hinges. Yet it would not do to say that a door is not known to the trade as such and dealt in every day, and that it would not be, if appearing in a tariff act, easily recognizable. An ax helve must be fitted before it is inserted in the ax, but that it is an ax helve, known as such, whenever it meets the eye, is apparent. Where a telephone pole is *installed*, it has added to it cross arms on which wires are strung and becomes part of the system, but it has reached the state of a telephone pole before that.

We are satisfied upon the whole record that these shipments as they arrived in this country represented the character of poles contemplated by Congress in the provision for telegraph, telephone, electric-light, and trolley poles; that they are fitted for and essentially adapted to these uses; that the mere notching of the poles is part of the installation, and very properly so, because different sizes of cross arms might be used and the notching if a part of the installation could be made to fit the width of the cross arms if not uniform; that the purpose of Congress was to provide for these poles by grouping them and in terms sufficiently comprehensive to include all that might be adapted to the uses stated; and that these poles answer that call.

The fact that some poles which are not specified as piles might be found in some importation suitable for that purpose while also adapted to use as telephone poles, or that electric-light or trolley poles might on occasion be used for power transmission, can not be given the force and effect of rendering absolutely nugatory the provisions of paragraph 170. The testimony of the case shows that no poles further advanced than those here in question, the ultimate use of which is for telephone, telegraph, electric-light and trolley poles, are imported. The witness Baxter, in answer to a question by General Appraiser Waite, "Are any of them," referring to the requirements of shaving, roofing, painting, creosoting, etc., "ever done before they are imported?" replied, "Not to my knowledge."

The contention of the importers and the holding of the board would lead to the result that although Congress saw fit to make provision for a duty upon the poles designated, there can be no room for the application of this provision because they are not sufficiently advanced to fix their use for any one of the purposes indicated. It does not need the citation of authority to affirm the rule that a construction which will render nugatory the express provisions of a statute is not to be indulged except in cases where no other reasonable construction is open. We think there is enough in this record to show that these poles are so far advanced, as when complying with specifications usual and current among dealers, to be devoted to some one of the uses named in the group, and that is a sufficient adaptation and dedication of the poles to bring them within the tariff classification.

We repeat, the fact that an occasional kindred use may be made of the poles other than for telegraph, etc., poles, does not prevent their classification for the purpose to which they are peculiarly adapted. It was said in Richards v. United States (3 Ct. Cust. Appls., 306, 308; T. D. 32587):

We do not lose sight of the fact that the evidence in the case at bar shows that these strings may be and sometimes are used for purposes other than as strings for

musical instruments, but that use seems to be incidental and does not affect the issue.

The same thing may be said in the present case.

So, in the case of United States *v.* Hempstead & Son (3 Ct. Cust. Appls., 436; T. D. 33004), in which we considered the provision for jute manufacturing machinery, it was held that machinery which was adapted to that use was dutiable as such even though susceptible of use for other purposes.

There is no eo nomine provision for these poles except as telegraph, telephone, electric-light, and trolley poles. In our view the Congress used these comprehensive terms so as to include and intended to include all that were of a character adapted to the uses indicated.

The cases relied upon by the board to sustain its ruling present essentially different issues from those here involved. In T. D. 25407, cited by the board, the board stated the condition of the timber as suitable for telegraph or telephone poles, unpeeled and trimmed only so far as was necessary to permit their being hauled through the woods and loaded on vessels for transportation to the United States, and the question was whether timber in such condition was dutiable under the provisions of paragraph 196 for telegraph and telephone poles or such as was entitled to free entry, a very different question from that presented in this case.

The board, however, cited as authority for the proposition that the fact that the poles were unpeeled in the case cited was not controlling (T. D. 27744), holding that the fact that logs were peeled does not take logs out of the class of round unmanufactured timber contemplated in paragraph 699. In that case the logs were shown to be 10 to 14 inches in diameter, with the bark removed, and the testimony showed that they were used for piling in the construction of railway bridges and trestle works over creeks and rivers, the paragraph under which they were assessed providing for "paving posts, railroad ties, and telephone, trolley, electric-light, and telegraph poles of cedar or other woods." It would seem improbable that the timber of these sizes would be even adapted for telephone poles or of the proper dimensions. Obviously they would not be suited to use as ties in their present form nor for paving posts. It was said, it is true—

It may be that the logs in question were adapted to one or more of the uses specified in this paragraph, but the provision here is not for logs or poles that are merely *suitable* for use as posts, ties, telephone, trolley, electric-light, or telegraph poles; but for such posts, ties, and poles, and therefore it would seem as though the collector's classification was erroneous.

It will be noted that the case does not show poles which were necessarily adapted to use as telegraph and telephone poles. It is possible that it might be said that prima facie they might be used

for poles, but this would depend upon their length, and the case fails to show what was the length of the timber there in question. So that there was not the eo nomine provision which would cover the timber there in question.

The board cites the case of United States v. Pearce, decided by the board in G. A. 5627 (T. D. 25136), holding that the removal of the bark and rough outer portion of pulp wood would not be construed to rise to the dignity of any sort of manufacture, which case was affirmed in United States v. Pearce (140 Fed., 962; 147 Fed., 199). In that case the contest was between wagon blocks, car blocks, or sticks, rough hewn, and logs and round unmanufactured timber, *including* pulp woods, firewood, handle bolts, shingle bolts, gun blocks for gunstocks, rough hewn, etc.

The ultimate decision of the Court of Appeals apparently rested upon the ground that the importation fell within the eo nomine designation of pulp woods, and said, inter alia:

The argument that by the use of the word "including," preceding the words "pulp woods, firewood," etc., in paragraph 699, Congress intended to put only such pulp woods on the free list as should also be round unmanufactured timber, is not persuasive. We think the word "including" was used as the equivalent of "also," a sense in which it is frequently employed in tariff acts.

The pulp wood there in question had been rossed, but the court said:

The evidence shows that while pulp wood has been designated in trade to some extent as rough pulp wood * * *, peeled pulp wood * * *, and rossed pulp wood, all kinds have been equally known as pulp wood and have not been considered as anything else until they are converted in the grinder or the chipper into pulp.

The case is easily distinguishable from the instant case.

We think, in the view which we have taken of the facts, this case is not distinguishable from United States v. Myers & Co. (4 Ct. Cust. Appls., 431; T. D. 33857).

Decision *reversed.*