(C. D. 1289)

## W. N. Proctor Company v. United States

United States Customs Court, First Division

(Decided December 27, 1950)

*Henry L. Ziegel* for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*Richard E. FitzGibbon* and *Alfred A. Taylor, Jr.*, special attorneys), for the defendant.

*Joseph F. Lockett* and *Reuben Hall*, amici curiae.

Before Oliver, Cole, and Mollison, Judges; Mollison, J., dissenting

Cole, Judge:  A shipment of 25 bales of greasy wool from Buenos Aires, Argentina, described on the invoice as "United States Official Standard, Mestiza, 56/58's, skirted, clothing, practically free from vegetable matter. Shrinkage 54%.," was entered at Boston, Mass., where it was classified under paragraph 1102 (b) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1102 (b)),[1] as wool in the grease, not specially provided for, and assessed with duty at 34 cents per pound of clean content.

Plaintiff's principal claim is that the merchandise is classifiable under paragraph 1101 (a) of the Tariff Act of 1930, as amended by the trade agreement with Argentina, 77 Treas. Dec. 138, T. D. 50504,[2] either under the *eo nomine* provision for Cordova wool, in the grease or washed, carrying a duty assessment of 13 cents per pound of clean content, or as "sorted, or matchings" therefrom, dutiable at 14 cents per pound of clean content.

---

[1] Par. 1102. (b)   Wools, not specially provided for, and hair of the Angora goat, Cashmere goat, alpaca, and other like animals, in the grease or washed, 34 cents per pound of clean content; scoured, 37 cents per pound of clean content; on the skin, 32 cents per pound of clean content; sorted, or matchings, if not scoured, 35 cents per pound of clean content.

[2] See the following table:

An alternative claim is made, contending that the collector's action is violative of section 315 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1315),[3] in that the assessment under paragraph 1102 (b), *supra,* invoked a higher rate of duty than had been applicable on this wool under an established and uniform practice.

The trial of this case consumed considerable time and resulted in a voluminous record consisting of testimony, exhibits, and lengthy briefs, including two from attorneys appearing as *amici curiae.*

The issue involved is strictly a question of fact. No legal questions have been raised, even as to rulings of the trial court during the taking of testimony. It becomes necessary, therefore, in weighing the evidence and placing the respective contributions—most of which have come from well-qualified witnesses—into scales to which they are properly assignable to determine which outweighs the other. In reaching our conclusion, we find it necessary to detail at some length most of the record.

Only a small portion of the testimony taken herein was introduced before the division. Most of the proof was offered before the writer of this opinion at Boston (where the case was finally submitted),

Table referred to in footnote: [2]

| United States Tariff Act of 1930: paragraph | Description of article | Rate of duty |
|---|---|---|
| 1101 (a)___ | Wools: Donskoi, Smyrna, Cordova, Valparaiso, Ecuadorean, Syrian, Aleppo, Georgian, Turkestan, Arabian, Bagdad, Persian, Sistan, East Indian, Thibetan, Chinese, Manchurian, Mongolian, Egyptian, Sudan, Cyprus, Sardinian, Pyrenean, Oporto, Iceland, Scotch Blackface, Black Spanish, Kerry, Haslock, and Welsh Mountain; similar wools without merino or English blood; all other wools of whatever blood or origin not finer than 40s; all the foregoing | |
| | In the grease or washed____ | 13¢ per lb. of clean content. |
| | Scoured____ | 16¢ per lb. of clean content. |
| | On the skin____ | 11¢ per lb. of clean content. |
| | Sorted, or matchings, if not scoured____ | 14¢ per lb. of clean content. |

[3] § 1315. Effective date of rates of duty.

On and after June 18, 1930, all goods, wares, and merchandise previously imported, for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent has been issued, shall be subjected to the duties imposed by this chapter and to no other duty upon the entry or the withdrawal thereof. Insofar as duties are based upon the quantity of any merchandise, such duties shall, except as provided in paragraph 813 of section 1001 and section 1562 of this title (relating respectively to certain beverages and to manipulating warehouses), be levied and collected upon the quantity of such merchandise at the time of its importation. No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of antidumping duties. (June 17, 1930, ch. 497, title III, § 315, 46 Stat. 695; June 25, 1938, 5 p.'m. E. S. T., ch. 679, § 6, 52 Stat. 1081.)

sitting as a single judge on circuit, having been assigned to hear or to hear and determine said litigation, by the chief judge pursuant to authority vested in him under the statute governing this court, 28 U. S. C. (1946 ed., Supp. III) § 254. The views of the writer of this opinion, set forth in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, questioning the jurisdiction of the division to decide a case somewhat similar to these proceedings, continue as the minority expression of the division. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering to views expressed in the *Bush* case, *supra*, but for the purpose of expediting the work of the court, the writer is preparing this opinion and participating in the decision and the judgment accompanying the same, with full realization that a member or members of the division, if adopting the views determining classification of the merchandise as embodied herein, do so with complete disapproval of the position taken in this paragraph by the writer of this opinion.

We now proceed to analyze and weigh all the evidence. Plaintiff introduced samples of different kinds of wool, i. e., the merchandise in question, plaintiff's collective exhibits 2–A and 2–B, and plaintiff's exhibit 3; a representative sample of Cordova wool, plaintiff's illustrative exhibit A; and two sheepskins with Cordova wool thereon, plaintiff's illustrative exhibits T and U. All of the 16 witnesses who appeared herein—8 for each side—accepted and recognized the said exhibits as representative of the respective commodities, and they were referred to by each witness in illustrating or explaining various phases of the testimony. To avoid repetition of exhibit numbers and somewhat simplify the present discussion, the above-mentioned exhibits shall be referred to hereinafter as follows: Plaintiff's collective exhibits 2–A and 2–B and plaintiff's exhibit 3, "the wool in question"; plaintiff's illustrative exhibit A, "the Cordova wool"; plaintiff's illustrative exhibits T and U, "the Cordova wool on skins."

John G. Wright, a wool importing broker, acting on behalf of and as representative for the South American exporter (Masurel & Cía.) of the shipment in question, completed the sale thereof to the importer, Harry N. Bloomfield Co. The merchandise was identified as "Mestiza wool, 56–58 quality," originating in Cordova.

Referring specifically to plaintiff's collective exhibits 2–A and 2–B, the witness testified he negotiated the sale of that wool to John R. Reilly & Co., identifying the cable sent to his principal in Buenos Aires (being the same company that shipped the present merchandise) and the reply thereto, explaining that the exchange of cables, plaintiff's collective illustrative exhibit L, was the direct result of the purchaser's, Reilly's, statement that "he would buy this lot of wool

if Masurel said it came from Cordova and was so invoiced." The South American exporter's compliance with the request is certainly not positive proof that the shipment is Cordova wool under the statute, said amended paragraph 1101 (a), if such is intended thereby.

The witness visited South America only once and then, in 1947, when he was in Buenos Aires for "less than three weeks." During that time, he was at the barracas in the central market every morning for a couple of weeks and observed grading, sorting, and packing of several kinds of wool for shipment to the United States. He was never in the Province of Cordova, but it is his understanding, based on hearsay, that Cordova wool comes from Cordova sheep in the Province of Cordova, recognition of such wool being based on the marking "Cordova" appearing on bales as they arrived at the barracas while he was there.

Cordova wool was described as "brashy wool, without very much felting properties. It is rather stiff and hairy, and contains kemp, a good many black hairs, and has not got the life or the spinning qualities which we get in a blooded wool, either of Merino or of English blood." It has a wide range in grades, extending "from 36–40's to maybe 58's." The finer edge runs as high as 50 per centum of the fleece. Two explanations were given of the term "Mestiza," known to the witness since 1912 or 1914. First, the witness stated that "Mestiza" means "mixed blood and mixed quality of wool" in its connotation to Cordova. Later, and the concluding statement of his testimony is that the term is applied to the finer portion of Cordova wool, and "Criolla" to the coarser portion of such wool.

Cordova wool, as received in the Buenos Aires market, is not in fleece form but broken into small pieces that have no "great adhesion to each other." The observation of "Mestiza" being sorted out of Cordova is explained in the statement that "merely the fine pieces are picked out from the loose wool which is in small pieces as it comes in from the farms."

"The wool in question" is sorted, apparel wool, although "not as even in quality of staple, etc., as many of the better apparel wools." "The Cordova wool" is "either cross-bred or deteriorated Merino," ranging in grades from "32's to I think 58–60's." It is the type from which "Mestiza" is sorted. "The Cordova wool on skins" is average Cordova.

Donald H. Heath, a wool broker who was employed by the previous witness at the time of the shipment in question, substantiates his employer's testimony concerning sales of the wool represented by plaintiff's collective exhibits 2–A and 2–B. The word "Mestiza" in the cables, plaintiff's collective illustrative exhibit L, *supra*, refers to "a very varied type of wool that has run out. It is pumpy with some burrs, and the condition is not too good, that is as far as shrink-

age is concerned. It is a native type of wool from a certain section of Argentina." This witness admitted being no expert either with Cordova carpet wool or the wool under consideration, his experience with both types of wool being very limited. We can assign little value to this testimony.

Edward W. Cox, partner in Harry N. Bloomfield Co., the importer, has been engaged in the wool business since 1918, handling practically all kinds of domestic and foreign wools. "The wool in question" is "Cordova, Buenos Aires wool." It has three types of fibers—i. e., kemp, coarse, and fine—extending in grades from 44s to 56s. The condition is indicative of native Buenos Aires wool. It is not sorted but "right in the fleece." All of it was sold to apparel mills.

John R. Reilly, proprietor of the company that imported plaintiff's collective exhibits 2–A and 2–B, *supra*, described himself as "an apparel man," never having sold wool to carpet manufacturers. He began importing Cordova wool and wool like the present merchandise in 1944. Prior thereto, he was familiar with Cordova wool only as he carried it among samples, but never bought or sold any. "The wool in question" was sold to and received by him as "Cordova-Mestiza." Knowledge of its source was obtained from the shipper. In other words, the statement is corroborative of the wool broker's testimony, heretofore outlined, that Reilly's purchases were made with definite understanding that the foreign shipper would state on the invoice that the wool originated in Cordova.

After importation, the commodity was offered as "scoured wool." It is a native, degenerated wool, with no vestige of merino wool remaining. It is dry with no yoke, has black hair, contains kemp, and the smoothness has run out. "The Cordova wool" is second clip— i. e., not grown to 12 months' growth but clipped twice a year—and includes grades from 36s to 58s. A percentage of the fibers thereof is coarser and rougher than anything in the "Cordova wool on skins," although in general the fibers in plaintiff's illustrative exhibits A, T, and U, *supra*, are the same as to "dryness, glossiness, roughness, color." The wool on the shoulders of "the Cordova wool on skins" is the same as "the wool in question."

Cross-examination was directed largely toward eliciting the distinction between "skirting" and "sorting." The testimony shows some confusion by the witness. Summarized, it seems to disclose that skirting is confined to first clip and consists of removing "undesirable portions of the fleece around the belly and the britch," while sorting is a step further than skirting. The process of sorting varies, depending upon the ultimate use intended for the wool. The present merchandise is sorted but, being second clip, was never skirted.

Max W. Schwerdt is a wool commission merchant with 25 years' experience, handling all kinds of wools, including Cordova, that con-

sist of many kinds of fibers varying in degrees of fineness, i. e., "very coarse, generally hard fiber; there is a fine bottom which is wooly, and a medium grade," extending from 36s to 56s. He never dealt in wool exactly like the present merchandise, but handled only mixed wools like plaintiff's collective exhibit 2–B. "The wool in question" is a native wool, "degenerated wool from Argentina or Criolla wool," that might be Criolla and might have come from the Province of Cordova, "probably Cordova wool." Although it has not been sorted into any particular grade, the coarse fibers have been taken out so it consists of "fine fibers out of mixed wool." Approximately 20 per centum of the fibers is like "the Cordova wool," made up of 12 months' clip containing 25 per centum second clip. Two catalogs were identified. One, illustrative exhibit C for identification, titled "SOUTH AMERICAN WOOLS" was published in 1927 by the Fuhrmann Wool Corp. "It is not used now, but it was used from 1927 through 1931 or so." The other, illustrative exhibit D for identification, titled "Descriptive List of SOUTH AMERICAN WOOLS Packed and Graded by S. A. Financiera y Comercial Fuhrmann, Lda." was published by United States Agents, but the witness added "it might have been printed here or in South America. I don't know."

Asked to state under what designation he would offer "the wool in question," the witness answered, "That depends on how or what it is offered to us as. It depends, I have to know the source of the wool. I would not be able to offer the wool without knowing where it came from and the people who shipped the bales told me where it is from. That is the way I would offer it. If I had to offer it without knowing where it came from, I would offer it as Argentina wool, Argentina carpet wool." The term "Mestiza" was defined as "mixed." Mestiza out of Cordova was sold by the witness "now and then at different times for a period covering twenty years."

The degree of uncertainty and vagueness attached to the witness' statements cannot be overlooked.

Arthur K. Smith, with 30 years' experience in the wool business, has become familiar with all kinds of wools from different parts of the world, including "the wool in question," described as "Cordova-Mestiza 50's–56's bulk," containing fibers, equal to about 20 per centum of its content, like those in "the Cordova wool." All statements concerning the origin and characteristics of the present merchandise and "the Cordova wool" are based on hearsay. The definition of "Mestiza" as "half-bred" differs from that given by the previous witnesses. Further contradiction of earlier testimony is recognition in "the wool in question" of fibers similar to merino wool and the selection of a piece, defendant's illustrative exhibit I, similar in fineness and appearance to merino wool.

Lewis Sears, Jr., has been engaged in the wool business for 35 years, handling foreign and domestic wool used for apparel purposes only. "The wool in question" is a "very good delivery of Cordova-Mestiza wool, one which we would be glad to accept." It is the kind of Cordova wool with which he has been familiar since 1941, and "looks very much like" the fine edge of "the Cordova wool." The term "sorting" includes two kinds of manipulation, i. e., "direct sorting," in which a particular grade is obtained; and "rough sorting," being the separation of the finer from the coarser fibers without attempting to grade the wool. "The wool in question," containing coarse black hair, kemp, with a fine bottom, is a rough sorting of "the Cordova wool."

Ralph H. Lindsay, dealers' and merchants' broker in wools, has been buying and selling Cordova wool since 1930 and began importing it in 1936. It is native wool, the finer part of the fleece being known as "Mestiza" and the coarser as "Criolla." "The wool in question" is "Mestiza," or the finer edge of Cordova, of run-down quality containing no merino wool, and has been rough-sorted. It is never sold to carpet manufacturers. "Skirting" relates only to fleece wool. It cannot be applied to "the wool in question" that is only part of a fleece, broken into so-called "sortings," separated or obtained from "the Cordova wool," a carpet wool.

Clarification of inconsistencies in opinions expressed in the foregoing outline of plaintiff's case, important toward determination of the issue before us, is abundantly prominent in the evidence adduced by defendant. We analyze defendant's proof with that outcome clearly resulting.

Joseph A. Tully, a well-qualified witness, has had 33 years' experience in the wool business, all of the time as an employee of Alexander Smith & Sons Carpet Co., where he began as a stock clerk and apprentice, with duties that included sampling and testing imported wools, including Cordova. In 1925, he became assistant wool buyer and in 1930 assumed his present position of wool buyer in which capacity he has bought all kinds of foreign and domestic wools. Since 1930, his annual purchases of Cordova wool have aggregated 3 to 5 million pounds.

The part of the world from which wool is received is determined from a combination of characteristics, i. e., color, staple, and fineness. Cordova wool comes from several provinces of Argentina, particularly the Province of Cordova and surrounding ones. It is obtained from a type of native sheep that have degenerated through the years since the earliest Spanish explorers. Hence, Cordova wool is a degenerated wool, containing a mixture of several grades of fibers, 40s to 56s, and distinctive in color from other Argentina wools. It cannot be sorted as a commercial proposition and is chiefly used in the manufacture of carpets.

"The Cordova wool on skins" exemplifies the varying degrees of fineness and the intermingling of fibers, characteristic of Cordova wool. In a shearing operation, the "kempier" and the finer fibers become so mixed that the use of tweezers would be necessary to separate the two classes. As a commercial proposition, such a procedure would never be undertaken.

"The wool in question" is not Cordova wool. On the contrary, it is a conglomeration of wools from Argentina, "pieces of various types." It is cross-bred wool, distinguishable from Cordova by its uniformity of fibers, and better staple, showing more blood and crimp. To substantiate the conclusion that it is not Cordova, a piece, defendant's illustrative exhibit V, was taken from "the wool in question" and described as "Corrientes" wool, grade 50s, showing "real blood and breeding in it" and in no way resembling Cordova.

"Mestiza" refers to a certain kind of sheep—a cross between a Criolla and a merino—that produces cross-bred wool like "the wool in question." Mestiza sheep are entirely different from Cordova.

A seller's description is not conclusive of the type of imported wool. Actual examination thereof is the final determination as to quality, shrinkage, and other distinguishing factors.

David M. Kellogg, one of the best-qualified witnesses, was shown to have had broad experience in the wool business. His activities were not limited to undertakings in this country but also extended to business in Argentina. He was a buyer and seller of wool, hides, and skins from 1902 to 1937, when he retired from business. South American wools handled by him include Cordova, cross-bred from the Province of Buenos Aires, wools from the Provinces of Entrerios, Salta, Corrientes, and also Chubut wools. Between 1920 and 1935, when he was in business in Argentina, he owned and operated large barracas—i. e., warehouses, where wools are stored, dried, sorted, and baled. During those years he purchased approximately 25 per centum of the annual supply of Cordova wool, or about five thousand bales each year, that were shipped to carpet manufacturers and dealers in carpet wools in the United States.

Cordova wool comes from five different South American provinces, and it varies in characteristics according to the province where it originates. Santiago del Estero ships a higher class of wool, containing a larger percentage of finer fibers and lighter in shrinkage. Cordova has heavier wool with longer staple, heavier shrinkage, and less of the finer sort. Caramarac and Rioja offer dirtier wools with higher percentage of shrinkage and coarser fibers. San Luis wool has heavier shrinkage and lesser resiliency in the finer wools. Mendoza produces wool of heaviest shrinkage.

Criolla sheep, from which Cordova wool is obtained, is a degenerate merino type, "a miserably mean animal with very little meat."

Cordova wool has always been the same. It is never sorted. To do so would be impractical from a business standpoint because of depreciation in value after removal of the finer edge (approximately 15 to 25 per centum) and the questionable commercial value of the portion taken from the fleece.

"The Cordova wool" is a mixture obtained from several provinces. "The Cordova wool on skins" is representative of the type received from the Province Santiago del Estero. The finer fibers are distinctly "a degenerate Merino."

"The wool in question" is a "cross-bred wool of English heritage," with pieces of skirtings, some second clip from the Province of Buenos Aires or surrounding provinces. It has none of the characteristics of Cordova wool. The quantity, defendant's illustrative exhibit V, *supra*, could not have been sorted or separated from Cordova wool because it is cross-bred, similar in color and fiber to the wool found in the Province of Corrientes or Entrerios. It is altogether different from Cordova wool.

Wool, like "the wool in question," was purchased in the markets of Buenos Aires that had "all the off-sorts from their standard grading of fleece wools" or that "made a habit of sorting off the odds and ends before they shipped the bulk of their fleeces." The wool was bought for scouring and carbonizing. After importation, it was burred and scoured or carbonized and then sorted into four grades—coarse, medium, medium fine, and fine—and sold as "scoured, carbonized wool"; never as Cordova wool.

"Mestizar," a verb, means the "crossing of animals and anything you breed from them." "Mestiza," an adjective, describes wool obtained from cross-breeding of two types or grades of merino.

Referring to the practice followed in invoicing merchandise in Argentina, the witness testified that a shipper's statement merely locates the wool but "does not identify the wool itself."

C. J. Fawcett, another witness of considerable experience, is the general manager of the National Wool Marketing Corp., a national wool-selling agency for its sixty to seventy thousand members. Over a period of 7 years, he sold 52 million pounds of domestic wool and 350 million pounds of foreign wool. The witness has been a breeder of sheep since 1905 and at present is associated with a ranch having four thousand sheep. In this connection, he has imported sheep for breeding and has exhibited specimens at various county, district, and state fairs, and also sold wools. Attendant with his experience as a breeder, extensive study, "both in school and practical" was made of various breeds, including Criolla.

Criolla sheep are found in South America, particularly in Cordova and adjoining provinces. They are native, wild sheep, and now recognized as a fixed type, a natural development from intensified cross-

breeding over a long period of years. The wool from Criolla sheep is recognized as cross-bred wool, frequently called "Mestiza," possessing characteristics peculiar to carpet wool as distinguished from apparel wool.

Wools, for practical purposes, are divided into two great divisions, i. e., carpet and apparel. Each displays definite qualities, making them easily distinguishable. Apparel wool has fiber that is uniform as to length and diameter, and a distinct crimp denoting a finished quality available for spinning into yarn in the manufacture of worsteds. Carpet wool, on the other hand, is like hair, without crimp, and has coarse, flat fibers, varying in diameter, usually a pointed tip and devoid of elasticity and spinning qualities.

"The wool in question" is cross-bred, apparel wool, most likely Corriedale, a type separate and apart from Cordova which is a carpet wool. Cordova wool is never sorted. Sorting is done only to apparel wools. The operation is a matching of fibers, the result therefrom being known as "Matches." None of the "wool in question" has been separated or sorted from Cordova wool. Testimony concerning the sample, defendant's illustrative exhibit V, *supra*, is substantially the same as that given by defendant's two previous witnesses.

"The Cordova wool on skins" is carpet wool, not usable commercially for apparel purposes. It is wholly unlike "the wool in question," none of which is sorted from anything in the "Cordova wool on skins."

C. Edwin Webb, another well-informed and greatly experienced witness, has been a wool merchant and manufacturer of woolen goods since 1903, and imported wool from every country growing it. Cordova wool comes from the province of Cordova and surrounding provinces in South America. It has long, coarse fibers, characteristic of native, run-down sheep, and throughout the years has always been the same. The witness neither purchased nor was ever offered any wool as Cordova-Mestiza, or as Cordova wool, sorted. His first knowledge of "Mestiza wool" was years ago when the term was used in connection with a grade known as "Chilean Mestiza wool," and he never heard it again until the last few years, and then "in relation to this wool case." "Mestiza" means "cross-bred."

The witness admitted executing an affidavit in which reference was made about the finer edge of a Cordova fleece being recognized as Mestiza wool. He explained his statement in the document as follows: "I think I stated that I never heard of this so-called Mestiza wool until this wool case came up and that was the reason for that affidavit if my memory serves me right was this wool case in which this finer wool in the Cordova wool was described as Mestiza. I recognize the fact that that finer edge of wool has always been in the Cordova wool and my affidavit is quite correct when I say that I recognize it. The so-called Mestiza wool has always been in there, but I think if

you will read back my testimony that I never heard of this Mestiza wool until these past few years when the thing was in controversy." Upon further interrogation whether he always recognized the finer wool in Cordova as Mestiza wool, the witness stated, "I have always recognized in the Cordova wool that there is finer edges of wool and of late it has been called Cordova Mestiza in the past few years. Up to that time we always recognized that Cordova wool had a finer edge in the wool."

It is fair to insert, at this point, that we find no contradiction between statements attributed to the witness in his affidavit and his testimony to the effect that the "wool in question" is not Cordova wool but a mixture of wools that might be called "matchings." The sample, defendant's illustrative exhibit BB, selected from "the wool in question" could not have been taken from Cordova because it is improved wool, showing more "strength of fiber than the Cordova and is more evenly grown." "The Cordova wool on skins" is materially different in character from "the wool in question" which is "stronger and better grown wool."

The distinction among skirting, grading, and sorting was explained. Skirting a fleece is to remove coarse wool around the edge and then repack and bundle the bales, the wool remaining in fleece form with the edges removed. To grade wool is to separate the fleece into lots according to the preponderance in type of the fibers. Sorting is a manipulation through which undesirable grades are removed. Grading is done in the warehouse; sorting in the mill where the operation is dependent on the ultimate use of the commodity.

Edward A. Martin has been engaged in buying and selling wools since 1926, when he made his first purchase of Cordova wool. Between 1926 and 1941, his firm bought approximately 36 million pounds of Cordova wool. It has always been the same, being a very light wool with a fine bottom and fine edge. He was in Argentina in 1937, 1941, and 1946, buying apparel and carpet wools, which include Cordova that was purchased in the original bales as received from the interior. There was never any indication that the fleeces were sorted, or finer fibers separated from the coarser, and no offer was ever made of the finer edge as Cordova-Mestiza.

"The wool in question" is not Cordova wool. It is straight sorted wool. "They are off-sortings. They are taken from various parts of fleeces, the exact districts would be difficult to say, but they are commonly known as off-sortings and some skirtings because I have seen this very stuff in piles in the Argentina Barracas." The portion, defendant's illustrative exhibit CC, taken from "the wool in question" is part of a run-out fleece and could not come from Cordova wool.

The witness first heard of the term "Mestiza" in the "last couple

of years," and "as an illustration" he bought three bales from a firm in Camden, N. J. Asked whether the "Mestiza" wool he purchased was sorted from Cordova, he answered, "I don't think so because it was an entirely different wool."

Counsel for plaintiff produced an affidavit, plaintiff's exhibit 8, executed by the witness, and stating in part, "that in the conduct of his [the witness'] business he has purchased and sold Cordova wool imported into the United States fully recognizing that it always contained a certain percentage of fine quality wool, commonly known as Mestiza wool." Without any contradiction of statements made in the said affidavit, the witness testified that "the wool in question" has "none of this fine wool or fine Mestiza that they refer to." In all of his purchases of Cordova wool, it has never been sorted to have the finer edge sold separately as "Mestiza," nor has it been offered or sold as Cordova-Mestiza.

James H. Patrick, an intelligent witness intimately connected for many years with the wool industry, has been associated, since 1920, with carpet manufacturers, in a technical capacity with respect to manufacturing operations, and also as a buyer of wool. He has purchased Cordova wool since 1925, generally as "fall clip Cordova," but never as Mestiza-Cordova. Some of the invoices have described the commodity as "Cordova Criolla." It has always been the same commercially, and cannot, as a practical proposition, be sorted to separate the finer from the coarser portions. "Mestiza" means mixed or cross-bred, and has been so applied to both sheep and wools, as well as to humans (Indians), but never used in the course of business with reference to Cordova wool.

Cordova wool is exclusively used for carpet purposes, usually as a blend with other constituent wools, the particular type being dependent on the kind of rug to be made. "The wool in question" is apparel wool, differing from Cordova in use, length of staple, strength of fiber, and in general character, particularly as to felting properties which are a distinct detriment for carpet wool. The intermingling of fibers is characteristic of both native and cross-bred wools.

Richard D. Oberholtzer, a carpet wool buyer since 1930, and Warner M. Buck, a market specialist in wool, employed by the Department of Agriculture in Washington, D. C., with previous commercial experience as a buyer and seller of wool, offered testimony that is cumulative of what other Government witnesses stated, as hereinabove set forth. It is therefore unnecessary to outline their testimony.

The record in its entirety is convincing that Cordova wool is received not only from the Province of Cordova but also adjoining provinces in South America, that it is grown on Criolla sheep (a

native, degenerate type), and, as described by plaintiff's witness, Wright, "it is what we call brashy wool, without very much felting properties. It is rather stiff and hairy, and contains kemp, a good many black hairs, and has not got the life or the spinning qualities which we get in a blooded wool, either of Merino or of English blood." The chief use for Cordova wool is in carpet manufacture.

The combined testimony of witnesses for both sides also establishes that a fleece of Cordova wool contains a percentage of finer fibers, between 20 and 25 per centum, but the finer and coarser portions are not and cannot be sorted as a commercial undertaking.

The term "Mestiza," as shown by greater weight of evidence, relates to a definite type of cross-bred sheep, growing a particular grade of cross-bred, apparel wool, that is stronger in staple and fiber construction, and generally better grown than Cordova. It is a class or grade of wool materially different from Cordova.

The preponderance in weight of the evidence establishes that the wool under consideration is not Cordova wool, nor "sorted, or matchings" therefrom, within the provisions of paragraph 1101 (a), as amended, supra, but is a mixture of Argentina wools, consisting of pieces of various types from different provinces or districts and recognized as "off-sorts" taken from different parts of fleeces. The merchandise, being a conglomerate mass of wools, is classifiable under paragraph 1102 (b), supra, as assessed by the collector.

The disposition of plaintiff's principal claim for direct classification under said amended paragraph 1101 (a) virtually eliminates from consideration the attempt to invoke the provisions of section 315, supra. In support of the claim under said section 315, plaintiff offered a series of letters, plaintiff's illustrative exhibits M, N, O, and P, sent by the Commissioner of Customs to the collector of customs at Philadelphia. These letters discuss certain kinds of Cordova and Valparaiso wools and apparently settled differences of opinion among customs officials at New York, Boston, and Philadelphia. The merchandise in question is not a type of wool mentioned in or covered by the said exhibits. On the contrary, it is something altogether different that never has been, so far as the proof before us shows, within the purview of section 315, supra. Hence, the claim thereunder is untenable.

Legislative history of tariff provisions for wool has been given much attention in the splendidly prepared briefs of counsel for the respective parties as well as in the briefs of amici curiae. The presentation by the able attorneys is interesting and enlightening, but in view of the reasoning followed and the conclusion reached herein, there is now no reason for injecting the subject in this opinion.

The protest is overruled and judgment will be rendered accordingly.

MOLLISON, Judge: I am constrained to dissent from the conclusion reached by my colleagues with respect to the principal claim made by the plaintiff in the case at bar, i. e., that the wool in question consists of the finer part sorted from Cordova wool and is dutiable at 14 cents per pound of clean content under the provision for—

Wools: * * * Cordova * * *, Sorted * * * not scoured * * *

in paragraph 1101 (a) of the Tariff Act of 1930, as modified by the Argentine Trade Agreement, T. D. 50504.

There seems to be no dispute, from the evidence offered, that the wool in question consists of sortings, or sorted wool, the real dispute centering around the question of whether it is sortings of Cordova wool or of other wool. On this point the testimony of the witnesses for both sides is irreconcilable, those for the plaintiff identifying the origin of the sortings as Cordova wool, and those for the defendant identifying it as wool other than Cordova.

The majority has considered the testimony of the witnesses and has concluded that the preponderance in weight thereof establishes the defendant's contention. The writer, too, has carefully studied the testimony of each witness, both with respect to qualifications and background, as well as with respect to the direct issue, and on the latter factor is persuaded to the opposite conclusion. It appears to the writer that the witnesses for both sides were equally qualified to give expert testimony on the point in issue. That a difference of opinion resulted is not uncommon in cases where both parties rely upon the opinions of expert witnesses in presenting their cases.

There is, however, a factor in this case which in my opinion compels greater probative force to be attached to the testimony given on behalf of the plaintiff than to that given on behalf of the defendant. The defendant's case is largely predicated upon testimony given by its witnesses to the effect that Cordova wool is never sorted, and the majority has held that—

* * * the finer and coarser portions [of Cordova wool] are not and cannot be sorted as a commercial undertaking.

If this position is adopted, it must follow that Congress did a vain, nugatory, and useless act in providing in paragraph 1101 (a) for "Wools: * * * Cordova * * *, sorted * * *," for the aforementioned testimony and the holding of the majority are a denial of the existence of the very commodity provided for by the tariff provision just quoted.

Such a construction is, of course, to be avoided. In a somewhat similar situation in the case of *United States* v. *Baxter et al.*, 9 Ct. Cust. Appls. 99, T. D. 37975, our appellate court said:

The contention of the importers and the holding of the board would lead to the result that although Congress saw fit to make provision for a duty upon the poles designated, there can be no room for the application of this provision because they are not sufficiently advanced to fix their use for any one of the purposes indicated. It does not need the citation of authority to affirm the rule that a construction which will render nugatory the express provisions of a statute is not to be indulged except in cases where no other reasonable construction is open.

The testimony offered on behalf of the plaintiff is consistent with and gives effect to the language of the tariff provision, and I am satisfied that considered in relation thereto it establishes that the commodity at bar is covered by the said provision.

In my view, therefore, judgment should issue sustaining the claim made by amendment of the protest for duty at the rate of 14 cents per pound of clean content under paragraph 1101 (a) of the Tariff Act of 1930, as amended by T. D. 50504.