(C. D. 1855)

HERMAN D. STEEL CO.
MORRIS FRIEDMAN *v.* UNITED STATES

United States Customs Court, Second Division

(Decided March 12, 1957)

*Schnader, Harrison, Segal & Lewis* (*Bernard G. Segal, Josephine H. Klein*, and *Bancroft D. Haviland* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Dorothy C. Bennett*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This cause of action relates to 99 importations of certain metal precision parts manufactured in Switzerland, in accordance with drawings and specifications, for assembly in this country into fuzes for the Armed Forces of the United States.

The importations were classified by the collector of customs as parts of a mechanism, device, or instrument for recording, indicating, or performing any operation or function at a predetermined time or times within the purview of paragraph 368 (a) (c) (6) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 368 (a) (c) (6)) and subjected to duty at the rate of 65 per centum ad valorem.

With the exception of the items covered by entries 12977 and 13294, plaintiffs contend that the parts here in controversy were either unfinished at the time of importation or were improperly made and required complete re-machining in order to be usable in time fuzes and, therefore, are not parts of fuzes and should properly have been classified as articles or wares, composed of metal, not specially provided for, within the purview of paragraph 397 of said act (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, for which duty at the rate of 22½ per centum ad valorem is provided.

In the event that the court should find the imported articles are parts of fuzes, it is then the position of plaintiffs, as to all of the importations, that the fuzes of which they are parts are provided for in paragraph 368 (a) (c) (6) of said act (19 U. S. C. § 1001, par. 368 (a) (c) (6)), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, and Presidential notification in connection therewith, 86 Treas. Dec. 337, T. D. 52820, as clock movements, dutiable at the rate of 32½ per centum ad valorem, and not as mechanisms, devices, or instruments suitable for performing any function or operation at a predetermined time or times, provided for in the basic act.

Furthermore, it is the contention of plaintiffs that there was not a compliance with the provisions of section 8.29 (c) of the Customs Regulations of 1943 and that the liquidation of the entries was, therefore, in violation of the requirements of the tariff act and the regulations pertinent thereto, with the result that the rate of duty of 32½ per centum ad valorem should be sustained as to all entries, which rate was used on entry of the first of the importations in issue as the result of a conference with customs officials.

The pertinent statutory provisions are here set forth. The language of section 8.29 (c) of the customs regulations will be quoted, *infra*.

Paragraph 368 (a) (c) (6), *supra*:

PAR. 368. (a) Clocks, clock movements, including lever movements, clockwork mechanisms, time-keeping, time-measuring, or time-indicating mechanisms, devices, and instruments, synchronous and subsynchronous motors of less than one-fortieth of one horsepower valued at not more than $3 each, not including the value of gears or other attachments, and any mechanism, device, or instrument intended or suitable for measuring time, distance, speed, or fares, or the flowage of water, gas, or electricity, or similar uses, or for regulating, indicating, or controlling the speed of arbors, drums, disks, or similar uses, or for recording or indicating time, or for recording, indicating, or performing any operation or function at a predetermined time or times, all the above (except the articles enumerated or described in paragraph 367), whether or not in cases, containers, or housings:

\*          \*          \*          \*          \*          \*          \*

(c)   Parts for any of the foregoing shall be dutiable as follows:

\*          \*          \*          \*          \*          \*          \*

(6)   all other parts (except jewels), 65 per centum ad valorem.

Paragraph 397, as modified, *supra*:

[397]   Articles or wares not specially provided for, whether partly or wholly manufactured:

\*          \*          \*          \*          \*          \*          \*

Composed wholly or in chief value of iron, steel, lead, copper, brass, \* \* \* aluminum, or other metal \* \* \*:

\*          \*          \*          \*          \*          \*          \*

Other (except slide fasteners and parts thereof)_____ 22½% ad val.

Paragraph 368 (a) (c) (6), as modified, *supra*:

[368 (a) (1) (2)]  Clocks, clock movements, including lever movements, time-keeping, time-measuring, or time-indicating mechanisms, devices, and instruments, and any mechanism, device, or instrument intended or suitable for measuring or indicating time (not including synchronous or subsynchronous motors of less than 1/40 horsepower valued not over $3 each without counting the value of gears or other attachments, and except the articles enumerated or described in paragraph 367, Tariff Act of 1930), whether or not in cases, containers, or housings:

\*        \*        \*        \*        \*        \*        \*

[368 (c)]  Parts for articles provided for in paragraph 368 (a), Tariff Act of 1930, shall be dutiable as follows:

\*        \*        \*        \*        \*        \*        \*

[(6)]      Parts provided for in paragraph 368 (c) (6), Tariff Act of 1930, for any article provided for in item 368 (a) (1) (2) in this Part _____ 32½% ad val.

The case presents a voluminous testimonial record, together with a large number of exhibits. In the interests of brevity and clarity, no good purpose would be served by a detailed exposition of the testimony as a part of this decision. Pertinent references thereto will, however, be made, *infra*, in connection with a consideration and determination of the issues before the court.

A motion to amend the protest of plaintiffs was taken under advisement by the trial judge. However, it was acted upon subsequent to the trial by this division of the court and need not be adverted to here.

We shall direct our attention to the first issue presented, namely, that the fuze parts in question were either unfinished at the time of importation or were improperly made and required complete re-machining in order to be usable in time fuzes and, consequently, are not parts of fuzes, but articles or wares, composed of metal, not specially provided for, in paragraph 397, *supra*.

A general rule of law which obtains in the classification of imported merchandise is that it is classifiable according to its character and condition at the time of importation. *Worthington* v. *Robbins*, 139 U. S. 337.

With the exception of entries 12977 and 13294, the importations were ultimately destined for the Westclox Division of the General Time Corp. Included in said importations were 29 different items of fuze parts, 18 of said parts being intended for use on Army fuzes, number M501, and 11 of said parts for use on Navy fuzes, number EX100 Mod. 0. It appears from the record that, when the Westclox

Division placed its orders with the Herman D. Steel Co., it was the practice to attach to said orders a blueprint supplied by the Ordnance Division of the Army, together with a shop drawing, prepared by the engineering department of Westclox, the latter drawing providing detailed specifications of the particular fuze part covered by the accompanying order. Copies of said orders, blueprints, and drawings were introduced in evidence as plaintiffs' collective exhibit 1, exhibits 7, 7–A, 9, 9–A, 11, 11–A, 13, 13–A, 15, 15–A, 17, 17–A, 19, 19–A, 21, 21–A, 23, 23–A, 25, 25–A, 27, 27–A, 29, 29–A, 31, 31–A, 33, 33–A, 35, 35–A, 37, 37–A, 39, 39–A, 41, and 41–A.

It is also disclosed by the record that a majority of the orders was placed for parts to be supplied in an unfinished condition, it being the intention of Westclox to perform additional processes on most of them after importation and before assembly into the respective Army or Navy fuzes. In view of the fact that the parts were precision parts, it was necessary that they meet Government specifications as to dimensions and finish. It was explained that all of the Navy fuze parts were ordered as unfinished parts (as were some of the Army fuze parts), the explanation being given that it was the experience of the ultimate consignee that, when it ordered finished parts, it was necessary, in any event, to perform quite some work on them to meet Government requirements, particularly as to finish. Moreover, by this method of purchase, the Westclox Division of the General Time Corp., doing its own tumbling and other secondary operations on the fuze parts after importation, was enabled to import the articles at a cheaper price. Speaking generally of the importations, witness John P. Gilligan, who appeared on behalf of plaintiffs and who played an important part in ordering the merchandise for the ultimate consignee and in the inspection of the importations upon their delivery, admitted that, on receipt, the parts had to be up to specifications dimensionally according to the drawings, before Westclox would even think of finishing them.

It further appears from the record that, after importation, various parts had to be subjected to tumbling, burnishing, mill slotting, countersinking, drilling, and/or coating with black oxide.

Benjamin D. Nabreski, chief of the Electromechanical Time Fuze Engineering Branch of the Artillery Ammunition Department, Frankford Arsenal, Ordnance Department, United States Army, who testified as a witness for defendant and who was personally familiar with every operation in the manufacture and assembly of the imported fuze parts, stated that, based on his experience, the processes of deburring, burnishing, and tumbling fuze parts are operations to improve the finish and would not cause any appreciable dimensional changes in the parts.

In support of their contention that the articles, as imported, did not constitute parts of time fuzes, plaintiffs rely on the cases of *American Import Co.* v. *United States*, 26 C. C. P. A. (Customs) 72, T. D. 49612; *United States* v. *Berger & Co.*, 13 Ct. Cust. Appls. 362, T. D. 41258; *Cleevelandt Corp.* v. *United States*, 30 Cust. Ct. 458, Abstract 57341; and *R. P. Oldham Company* v. *United States*, 41 C. C. P. A. (Customs) 53, C. A. D. 528.

In the *American Import Co.* case, *supra*, certain merchandise, invoiced as "silk fishing-leader gut," which had been classified as manufactures of silk in paragraph 1211 of the Tariff Act of 1930, was claimed to be properly classifiable in paragraph 1535 of said act either as leaders or casts, finished or unfinished, or as fishing tackle and parts thereof, finished or unfinished. The court, in upholding the trial court's affirmance of the collector's classification, stated as follows:

It has long been the generally accepted rule that a thing may be classified for tariff duty purposes under the *eo nomine* provision for the article unfinished if that thing has been so far processed towards its ultimate completed form as to be dedicated to the making of that article or that class of articles alone. *Konishi Kotakudo Co. (Inc.)* v. *United States*, 17 C. C. P. A. (Customs) 355, T. D. 43798; *A. H. Ringk & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 132, T. D. 42769; *United States* v. *Cartier (Inc.)*, 15 Ct. Cust. Appls. 334, T. D. 42493; *United States* v. *Schenkers, Inc.*, 17 C. C. P. A. (Customs) 231, T. D. 43669; *Hecht Pearl Co. (Inc.)* v. *United States*, 18 C. C. P. A. (Customs) 171, T. D. 44375; and *United States* v. *Cohn & Rosenberg, Inc.*, 19 C. C. P. A. (Customs) 137, T. D. 45259.

\*  \*  \*  \*  \*  \*  \*

\* \* \* The mere fact that the instant merchandise is chiefly used, or for that matter exclusively used for leaders (and if it has any other use it is a fugitive one), does not take it out of the "material" class. Hundreds of articles might be suggested which are in the nature of material and which have found but one use. The mere fact that a thing has but one use does not require that it be considered as an article unfinished. If the material has been so far processed from the "material" stage to a partly-completed article, then it loses its character as material and takes on the characteristics of the article for which the material was intended. \* \* \*

Applying the reasoning of the *American Import* case to the facts presently before us, it would appear that it supports the classification by the collector rather than the claim of plaintiffs, inasmuch as the importations have lost their character as basic material (steel, brass, or aluminum) and have taken on the characteristics of the articles for which the material was intended, namely, fuze parts.

Inasmuch as the *Berger* case, *supra*, dealt with the question whether the provision for blown-glass articles in paragraph 218 of the Tariff Act of 1922 encompassed such articles in an "unfinished," as well as in a "finished" state, in the light of the qualifying language applicable to other provisions of said paragraph, said case is not deemed of value in the determination of the present issues.

The *Oldham* case, *supra*, involved the classification of certain cotton fish netting, described in the entry as "cotton fishing nets," which

were classified by the collector as a manufacture of cotton in paragraph 923 of the Tariff Act of 1930 and claimed to be properly classifiable as fishing nets in said paragraph 923, as modified by the General Agreement on Tariffs and Trade, *supra*. The facts of that case having established that the netting, as imported, was only a part of a completed fishing net, the articles there involved did not fall within the provision contended for by plaintiff, inasmuch as the *eo nomine* provision for fishing nets did not include parts of such nets, but was limited to complete nets.

We fail to see how the *Oldham* case, *supra*, has any application to the issue here presented.

The case primarily relied upon by plaintiffs in support of their contention that the imported articles, because of their condition at the time of importation, were not parts of fuzes, but articles or wares, not specially provided for, is that of *Cleevelandt Corp.*, *supra*. Certain merchandise, described on the invoices as "billes saphir" and as "balls for stylographe," were classified as parts of fountain pens or stylographic pens in paragraph 1550 (b) of the Tariff Act of 1930. In view of the fact that, upon importation of said synthetic sapphire balls and their insertion in the pens with which they were to be used, it developed that the pens were faulty, with the result that every pen sent out to the distributors was ultimately returned, the court, in that case, stated that—

* * * The fault was found to lie in the fact that the imported synthetic sapphire balls were not perfect spheres, were uneven, and not round, which caused the socket in which they traveled to assume an oblate or uneven shape, in turn causing leakage. In each case, the imported article was replaced by a steel ball.

The court was there presented with the question whether the articles, in their condition as imported, were parts of fountain pens. In arriving at a negative conclusion to the question presented, the court stated:

* * * we must distinguish between articles which in their imported condition are poor, or inefficient, parts of fountain pens, and articles which in their nature are not parts of fountain pens at all. The former would take classification under the provision for parts of fountain pens, while the latter, of course, would not.

The record shows that it is a requisite of a ball point pen that the ball point be perfectly spherical, and it also shows that the synthetic sapphire balls here involved were not perfectly spherical. It would seem to follow from this that the imported articles were not ball points and, consequently, not parts of ball point fountain pens.

We believe the facts of the *Cleevelandt* case, *supra*, are clearly distinguishable from those here presented. Although the present record discloses that the fuze parts at the time of importation were unfinished and possibly deficient for precision purposes, it, nevertheless, likewise appears from the record that they had the character of fuze parts and, after various finishing processes were applied and, in a

few instances, minor alterations made, said articles were, in fact, used as parts of time fuzes.

Reference has been made by counsel for the defendant, in its brief, to several cases dealing with this phase of the case, some of which will be referred to briefly.

In *United States* v. *Riga*, 171 Fed. 783, certain rough dashboard rifle barrels were held to be dutiable as parts of rifles, despite the fact that they had to be rifled, polished, and colored before they would assume the state in which they would be fit for practical use.

In the case of *United States* v. *Lyon & Healy*, 4 Ct. Cust. Appls. 438, T. D. 33873, violin necks, which were imported cut to shape, but not polished or fitted, nor bored with holes for the keys, were held to be properly classifiable as parts of musical instruments in paragraph 467 of the Tariff Act of 1909. Of like effect was the case of *Richard & Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 470, T. D. 33883.

Reference is also made to the case of *Geo. S. Bush & Co., Inc.* v. *United States*, 32 Cust. Ct. 316, C. D. 1620, wherein certain magnesium castings in the form of unfinished clutch housings, magneto housings, and fan housings were found to be parts of machines, not specially provided for, in paragraph 372 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, rather than as articles, wares, or manufactures of magnesium, not specially provided for, in paragraph 375 of said act, as modified. After a consideration of numerous precedents, the court there stated:

> Running through these cases is a reiteration of the rule heretofore recited that where an article has been so far advanced in manufacture as to be dedicated to a specific use, and to have no other use or ultimate intendment, it is to be regarded, for tariff purposes, as the article it is intended to be when completed. Particularly is this so in the case of articles which, in their finished condition, are destined for use as parts.

From the fact that plaintiffs point out in their brief that the imported articles (other than those covered by entries 12977 and 13294) were not up to specification and usable in their condition as imported, there may be some question whether the provision for parts in paragraph 368 (c) (6), *supra*, is applicable to parts in an unfinished condition. However, we believe that the reasoning in the *Riga* and *Lyon & Healy* cases, *supra* (see, also, *Waltham Watch Co.* v. *United States (Jaeger Watch Co., Inc., Party in Interest)*, 25 C. C. P. A. (Customs) 330, T. D. 49425), applicable to similar "parts" provisions of the tariff act, applies with like effect to the provision of paragraph 368 (c) (6) and dispels any doubt that the provision for "parts" therein contained refers to such articles in an unfinished, as well as in a finished, condition.

From the testimonial record before us and an examination of samples of the imported articles in evidence, both in their condition as

imported and after additional processes have been applied thereto, it appears that the articles, as imported, were dedicated to use as parts of time fuzes, having been designed and manufactured for that sole purpose, and, although some of them may have been in an incomplete or unfinished state, they were, nonetheless, parts of time fuzes and, after the application of further processing, which did not affect the dimensional characteristics of the articles, were actually used in the making of fuzes.

Having come to the conclusion that the imported articles are parts of time fuzes, it remains to be determined whether such fuzes are, in fact, clock movements of the kind provided for in paragraph 368 of the Tariff Act of 1930, as modified, *supra*, as alleged by plaintiffs, or are mechanisms, devices, or instruments for performing any operation or function at a predetermined time or times within the purview of said paragraph 368 of the basic tariff act, as classified by the collector. For a resolution of this question, we resort to the record to ascertain the operation, function, and purpose of these particular time fuzes. Although details of the Navy fuze EX100 Mod. 0 are still considered confidential information, and a description thereof by the witnesses who appeared before the court was necessarily limited, it is inferable that the testimony given as to the functioning of Army fuze M501 would be equally applicable to the Navy fuze.

Gene Rove, employed in the Frankford Arsenal at Philadelphia as chief of the Research and Development Section of the Mechanical Time Fuze Branch, United States Army Ordnance Department, testified on behalf of plaintiffs. He stated that time fuzes, such as those received from the Westclox Division of the General Time Corp., are used in 75-millimeter, 105-millimeter, and 155-millimeter shells. With reference to plaintiffs' exhibit 4, identified as a type of fuze Westclox Division manufactures for the Frankford Arsenal, the operation of the fuzes was described as follows:

* * * There are around this aluminum body graduations which are considered to be seconds. There is on this brass lower cap a setting line. The proper operation of the fuze dictates that the setting line be turned in a counterclockwise direction until it has aligned itself with a certain number, a certain numerical setting here on the aluminum body. The fuze is then fired from a gun, together with the shell, loaded shell, and at some time or some distance away, the clockwork will complete its cycle, the firing pin will initiate an explosive train, and the shell will detonate.

In explanation of the principles on which the timing movement operates and the forces which are utilized in causing the weapons to explode, Rove testified that—

The timing mechanism operates on a basic clock principle. There is an escapement in here, and an escapement principle which oscillates at a specific frequency. There are two driving members, these weights, which have the

effect of centrifugal force, are forced to the outside, to the external part of the fuze, and in being forced out they tend to drive this center number 5 pinion, which in turn drives the gear train down to the escapement. Then there are two assist springs. These augment the effect of centrifugal force, and as was stated in the book, provide additional force which may be required in the case of low spin weapons such as the 155 millimeter Howitzers, where the effect of centrifugal force may not be great enough to permit the weights themselves to drive the fuze.

Q. Will you go through the steps followed by a gun crew in firing such a shell?—A. Yes. With each gun there is issued by the Ordnance Corps a firing table. This firing table takes into consideration such things as gun wear and elevation. The normal procedure is as follows: The gun commander, or the officer in charge, will estimate the distance his barrel is from the target. For example, let us say he has estimated three thousand yards. He then determines the elevation of the gun, which is very easy to see. It is right on the gun. He then goes to his firing table and determines the proper setting, the proper time setting in order to cause this projectile to detonate at the required distance with the required elevation, and he fires a shot or two. He then determines, or his observer determines where this shell went off. If it went off short, it means in effect that the timing mechanism has caused the shell to detonate too early, and he increases the time setting proportionately. If it went off past the target, just the reverse would be true, and he would decrease the time setting. What he is trying to do is make sure that the shell goes off at the target.

The primary objective of a gunner in setting the fuze in an artillery shell is to have the shell go off at the target. Rove testified that plaintiffs' exhibit 4 is a dual-purpose fuze, explaining that, in addition to being a mechanical time fuze, it has incorporated in it a point detonating element, so that if the shell should strike a target or any solid object prior to actuation of the timing mechanism, it would cause detonation. He stated that, normally, if the fuze is fired strictly for impact against such things as tanks or pillboxes, it is fired set, so that the timing mechanism will not function, and the only thing which will cause actuation will be the impact of the fuze upon the solid object. He added that the prime function of a mechanical time fuze is to have the shell burst in the air prior to its hitting the target. The effect of kill is much greater if the shell bursts 50 or 60 feet in the air, for the reason that the shrapnel and general detonating effects are more severe than if the shell goes into the ground and detonates. Fuzes represented by exhibit 4 are usually used in a ground-to-ground missile and are fired against land targets, as opposed to aircraft. The maximum time setting for which exhibit 4 may be set is 75 seconds, and the minimum time is about 2 seconds. Rove stated that the purpose of the fuze is to explode the ammunition in the shell and that the timing mechanism causes the explosion to take place at a certain time.

Defendant's witness Nabreski testified with like effect as to the operation, function, and purpose of the fuzes of which the imported articles were to form parts and added that the fuze cannot actually

tell the hour or time of day like a clock, but that its primary purpose is to explode a shell at a predetermined time, which purpose is the only timing function of the fuze.

From the facts of record before us, it is evident that the fuzes, of which the imported articles are to form parts, having as their prime purpose the detonation of an explosive charge at a prior deliberately set time, are not the clock movements of paragraph 368 (a) (1) (2) of the tariff act, as modified, *supra*, as claimed by plaintiffs, but are, in fact, mechanisms, devices, or instruments to perform a function at a predetermined time.

The prime purpose of clock movements is to tell time, whereas the prime purpose of a mechanical time fuze is to explode a shell at a predetermined time.

We shall now consider the third point raised by plaintiffs, which is that the noncompliance with the provisions of section 8.29 (c) of the Customs Regulations of 1943, as amended, precludes liquidation of the entries at more than the 32½ per centum ad valorem duty, which rate was used on entry of the first of the importations in issue after conferring with customs officials.

On this phase of the case, the record discloses that, prior to the importation of any of the controverted merchandise, Philip Steel sought information of Frank E. Randa, then assistant appraiser and customs examiner at Philadelphia, as to his opinion of the applicable rate of duty which would be applied to a steel pinion which was shown to Randa. At that time, Randa was informed by Steel that the article was to be used for an Army fuze which contained a clockwork mechanism.

Both Philip Steel and his late father, Herman D. Steel, connected with the Herman D. Steel Co., one of the plaintiffs herein, were well known to Randa as importers of watch and clock parts or mechanisms, and it was a usual practice for importers to consult with him on matters of this kind prior to importation. The pinion which had been shown to Randa was of a form or character which might be used in a clock. The particular pinion was not introduced in evidence as an exhibit, and there is no evidence that importations of that particular pinion were ever made.

After reviewing the various provisions of paragraph 368 of the tariff act with Steel, at which time the provision for mechanisms which operate at a predetermined time was discussed, Steel expressed the opinion that he considered the clockwork mechanism provision applicable. Orders were subsequently placed, importations began to arrive, and entries thereof were made by Steel, in accordance with the parts of clock movements provision.

It was explained by Randa that his duties as customs examiner were to examine and inspect imported merchandise and to make a

report to the appraiser, in order that that official, in turn, might make an advisory classification and report to the collector of customs.

The first actual importation of fuze parts to come to Randa's attention occurred on March 3 or 4, 1953, and was the subject of entry number 9938. The items described therein are steel pinions WX-3 and WX-5, manufactured by W. Siegrist & Co. of Grenchen, Switzerland. When these pinions came in and Randa passed on them, he had no knowledge of what they were intended to be used for and took official steps to obtain information before passing upon them. Samples were extracted and submitted to the Customs Information Exchange in New York on customs Form 6431 (defendant's exhibit H). He assumed that these were the items about which Mr. Steel had spoken to him. In reply to his request for information, the Customs Information Exchange replied as follows:

No record of these items at New York or other ports. No contrary value information. It is assumed that these parts are not parts to be used in a mechanism performing a function or an operation at a predetermined time or times.

Similar precision parts continued to arrive during the spring of 1953 and, in each instance, where a different Swiss manufacturer was involved, Randa, in accordance with the customs regulations, submitted similar customs Forms 6431 for information and advice (defendant's exhibits I, J, K, and L). In answer to Randa's inquiry, represented by defendant's exhibit I, the following information was supplied by the Customs Information Exchange:

No record of shipments from this manufacturer at New York. Last record time fuze parts are classified as parts of a machine performing or recording any function or operation at a predetermined time or times.

Said record involved entry 14682 of January 31, 1953, made at Ambassador Bridge (Detroit).

It appears that the first knowledge that Randa had that the importations before the court might be parts of mechanisms performing a function at a predetermined time was when he conferred with Philip Steel by telephone in July 1953. At that time, he informed Steel he had been advised that similar items were being imported at other ports as predetermined time mechanisms. Steel, thereupon, contacted the Westclox Division, the actual consignee, and, subsequently, relayed to Randa the information obtained that the parts were for an Army time fuze which was to set off an explosive charge at from 2 to 75 seconds from the time it was set, utilizing a clockwork mechanism. At the time of this conversation, Randa had not yet made any advisory return or classification on any of the shipments, for the reason that it was the policy of the Philadelphia customs office to give importers every opportunity to prove their claimed classification, and he was awaiting additional information from Steel.

There were various other conferences between the importer and customs officials involving questions (1) whether, in the light of the *Cleevelandt* decision (referred to, *supra*), the imported fuze parts, due to their unfinished and poor condition, should not be classified as parts of fuzes, but as articles, composed of metal, not specially provided for, within the purview of paragraph 397 of the tariff act, as modified, or (2) whether the fuzes, of which the importations would form parts, being analogous to alarm clocks, should receive the benefit of the classification and rate contended for by plaintiffs.

During the course of the numerous conferences above referred to, Randa told Steel that he would give the importer additional time to produce further evidence and that he would wait a reasonable length of time before returning the invoices.

Randa did not place any notation on the delivery permits, pursuant to section 8.29 (c) of the customs regulations, as amended, *infra*, to the effect that there might be an increase in duties over the entered rate, for the reason that he did not know at that time that the rate would be increased. The delivery permits were issued immediately upon examination of the merchandise, which usually occurred within a week of the date of entry.

Subsequently, written notice of advance in rate from the entered rate of 32½ per centum ad valorem, as parts of clock movements, or at 22½ per centum ad valorem, as articles, composed of metal, not specially provided for, to 65 per centum ad valorem, as parts of devices to perform a function at a predetermined time, was given by Randa to the Morris Friedman Co., the importer of record, and, since it was not the practice to retain a copy for the office files, he could not specify the date of the first of these notices. At the time of sending the written notice to Friedman, he also telephoned Steel, the consignee of record, so that he would be informed. Copies of said written notices of rate advance were received in evidence as plaintiffs' collective exhibit 43, the earliest of which shows the date "Oct. 1, 1953." Randa stated that he had notified Steel in July, August, September, and October 1953 that he was going to advisorily classify the importations at the 65 per centum ad valorem rate of duty.

As some evidence of the fact that Steel was alerted to the probability of a rate advance, it is observed that purchase order number 53–4402, dated April 13, 1953, received in evidence as part of plaintiffs' collective exhibit 1, and placed with Herman D. Steel for "Fuze M501 Centrifugal Shaft FB28422, turned in accordance with blueprint Attached," indicates the price as "Subject to 15% price increase if higher duty rate is assessed."

Finally, in April 1954, Philip Steel requested Randa to return the invoices immediately, for the reason that the Steel company had to

make a claim for income tax purposes and that the report had to be filed before May. Randa diligently applied himself to the entries and made a return on all of them, and the collector of customs subsequently accepted his advisory classification, which was as parts of a mechanism, device, or instrument for performing any function or operation at a predetermined time or times, within the purview of paragraph 368 (c) (6), dutiable at 65 per centum ad valorem.

Against the foregoing factual background, let us direct our attention to a consideration of whether or not there has been compliance with the customs regulations, which regulations concededly rise to the stature of law. We here set forth the provisions of section 8.29 (c) of the Customs Regulations of 1943, as amended in 87 Treas. Dec. 336, T. D. 53150—

> If the examiner believes that increased or additional duties or taxes imposed upon or by reason of importation will be found due in respect of any merchandise in the shipment, he shall indicate the reason by means of an explanatory notation, such as "Rate Advance," "Value Advance," "Excess," etc. If the estimated aggregate of the increase is over $50, the notation shall so state. This notation shall be on or accompany the delivery permit if it involves packages designated for examination at the appraiser's stores and the examiner is in possession of information indicating a probable increase in duties or taxes prior to issuance of the permit. Otherwise, the notation shall be furnished, on such form as may be appropriate at the port, to the importer of record promptly upon receipt of such information, whether the merchandise has been examined at the appraiser's stores or elsewhere.

Said section was subsequently amended in 89 Treas. Dec. 3, T. D. 53412, to read as follows:

> If the examiner believes that the entered rate or value of any merchandise in the shipment is too low, or if he finds that the quantity imported exceeds the entered quantity, and the estimated aggregate of the increase in duties exceeds $15, he shall promptly notify the importer of record, on such form as may be appropriate at the port, as to the value or rate believed to be applicable or as to the excess quantity found. If the correct rate, value or quantity cannot be immediately determined or if the information is too voluminous to be set forth in detail, the notice shall specify the nature of the difference by means of an explanatory notation such as "Rate Advance," "Value Advance," or "Excess," and shall advise the importer to call at the examiner's office for additional information. The notice shall be furnished at the time the examination packages are released or as soon thereafter as the information is received by the examiner, whether the merchandise has been examined at the appraiser's stores or elsewhere. The importer shall be afforded a reasonable opportunity to present objections to proposed advances in rate or value prior to completion of action with respect to advisory classification or appraisement.

The purpose of the last-cited amendment is given in the prefatory language of said T. D. 53412 as follows:

> The purpose of the following amendment is to provide the importer with a prompt notice of proposed disagreement with the entered rate or value and to afford him a reasonable opportunity to present objections should he desire to do

so. The practice of furnishing this information on the permit to release is discontinued, as this form must be surrendered to obtain delivery of the examination packages and is frequently not seen by the importer of record.

The information will be furnished whether or not a specific request for value information has been filed under the provisions of section 14.4 of these regulations. Appraising officers will continue to furnish information in their possession prior to entry in response to such specific requests, but in order to avoid unduly burdening examiners with routine inquiries importers should limit requests to those instances in which appraising officers may reasonably be expected to be in possession of information not readily available to the importer.

When a consideration is given to the course of events which preceded the issuance of the written notice called for by section 8.29 (c), *supra*, and the ultimate advisory classification by the appraiser's office at Philadelphia of the importations covered by the entries in controversy, it is apparent that there has been compliance with the foregoing customs regulation and that the customs officials had acted with the best interests of the importers in mind, consistent with the duties and responsibilities imposed upon them by the customs regulations. It is a fair inference that a written notice of rate advance was given to the importer of record as soon as it was finally determined that a higher rate of duty applied to the importation of fuze parts. The delay in a prior determination of that fact may be attributable to Steel's insistence upon the applicability of a lower rate and the desire of the appraiser's office to give the importer every opportunity to prove its contention.

It is disclosed by the record that the Herman D. Steel Co. has been engaged in the importing business for more than 30 years; that said company had a number of importations during that period involving articles within the purview of paragraph 368 of the tariff act; that the firm subscribes to the weekly published Treasury Decisions pamphlets; and that every effort is made to follow changes in said act by trade agreements and to familiarize themselves with the customs regulations. It was brought out at the trial and referred to in plaintiffs' briefs that, as a result of the liquidation of the entries at the 65 per centum ad valorem rate of duty, plaintiffs had suffered a substantial loss of revenue, by virtue of the fact that they had predicated their fixed price contracts with the supplier based upon a lower rate of customs duties. It might be pointed out that, prior to the importation of any of this merchandise, plaintiffs had the right (which the record shows they subsequently exercised in connection with other importations) to apply to the Commissioner of Customs in Washington, D. C., for a binding rate of duty applicable to the importations they intended to make, which rate of duty in an ordinary case would not be subject to change, without due notice. Section 16.10a, Customs Regulations of 1943, as amended by T. D. 52588 (85 Treas. Dec. 302).

We deem the contention of plaintiffs herein that there had not been a compliance with section 8.29 (c) of the customs regulations and that, consequently, the liquidation of the entries by the collector of customs was invalid, is without merit.

After careful consideration of the record before us, we are constrained to hold that all claims of the plaintiffs must be overruled.

Judgment will be entered accordingly.