**PISTORINO & COMPANY, Inc.,**
**Plaintiff,**

v.

**UNITED STATES, Defendant.**

C.D. 3538; Protest No. 62/8246–17079.

United States Customs Court,
Second Division.

Aug. 19, 1968.

Henry L. Ziegel and Walter E. Doherty, Jr., Boston, Mass., for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Mollie Strum, New York City, trial attorney), for defendant.

Before RAO, Chief Judge, and FORD, Judge.

RAO, Chief Judge:

This protest placed in issue the tariff status of certain metal stampings, classified as latch needles, and their assessment with duty at the rate of $1 per thousand, plus 30 per centum ad valorem, pursuant to the provisions of paragraph 343 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739, supplemented by Presidential notification, 86 Treas.Dec. 337, T.D. 52820. It claimed that these articles were properly classifiable as stamped steel shapes, not advanced in value or condition by any process or operation subsequent to the process of stamping, dutiable at the rate of 12½ per centum ad valorem, under paragraph 304 of said act, as modified by said Torquay protocol, or, alternatively, as articles or wares, not specially provided for, composed wholly or in chief value of steel, dutiable at the rate of 19 per centum ad valorem, under paragraph 397 of said act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas.Dec. 150, T.D. 54108.

The relevant statutory language reads as follows:

Paragraph 343 of the Tariff Act of 1930, as modified, supra:

Latch needles................................$1 per 1000
and 30% ad val.

Paragraph 304 of the Tariff Act of 1930, as modified, supra:

\* \* \*; pressed, sheared, or stamped steel shapes, not advanced in value or condition by any process or operation subsequent to the process of stamping; \* \* \* all the foregoing valued over 16 cents per pound ...........................12½% ad val.

Paragraph 397 of the Tariff Act of 1930, as modified, supra:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\* \* \* \* \* \* \* \*

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\* \* \* \* \* \* \* \*

Not wholly or in chief value of tin or tin plate:

\* \* \* \* \* \* \* \*

Other, composed wholly or in chief value of steel .................... 19% ad val.

In a previous trial of this action, Pistorino & Company, Inc. v. United States, 53 Cust.Ct. 174, C.D. 2491, this court sustained plaintiff's claim under said paragraph 397. The case is now before the court after a rehearing in which defendant adduced testimony and evidence for the first time and plaintiff introduced additional evidence and testimony. Before considering the new testimony, it will be useful to review the first trial, the decision resulting therefrom, and the reasoning behind it.

At the outset it may be observed that a latch needle is a knitting machine needle which has a small metal latch alternately opening and closing over the needle's hooked end during the knitting process. Although the articles in controversy were imported in an unfinished condition, implicit in their classification as latch needles in view of the principles which will be discussed, infra, is the presumption that they were dedicated to use as latch needles.

The first issue in this case was and is whether the imported metal shapes were normally used in the manufacture of other articles besides latch needles and, hence, were not dedicated to use as latch needles. Also at issue in light of the wording of paragraph 304, under which plaintiff made a claim for classification, was the state of advancement of the importation.

Plaintiff originally introduced the testimony of two witnesses. Mr. Richard L. Gysan, president of Gysan Associates, the ultimate consignee of the merchandise at bar, testified that he was a manufacturer's representative and had ordered these importations for the use of the Laconia Needle Manufacturing Company. He stated that such articles were ordered by specifications in order to obtain a piece of steel which would conform as closely as possible to the needs of the final product. Mr. Gysan was unable to say what the final product would be in the case of the instant importations.

Plaintiff's second witness was Mr. Howard L. Bacon, the general manager of the Laconia Needle Manufacturing Company, and the person in charge of production. He testified that Laconia Needle Manufacturing Company manufactures metal products, pointed needles and latch needles, and sells them to the textile, electronic, and machinery industries.

Three samples of the articles in dispute, identified by this witness, were introduced in evidence as plaintiff's exhibits 1, 2, and 3. These metal shapes were listed on the invoice respectively as Vosata 100.100/4, Wosa 81.100/4, and Vo 76.68/4.

To the unpracticed eye these exhibits appear as follows: They are thin metal strips from $3\frac{1}{4}$ to 4 inches long, relatively smooth in appearance. Exhibits 1 and 3 basically resemble the letter T with the vertical portion truncated and off-center. In addition, one of the arms of the horizontal is cut in a configuration which remotely resembles that of the ordinary house key. Exhibit 2 is similar except that it has two vertical portions.

Mr. Bacon testified that exhibits 1, 2, and 3 were used to make metal parts and metal blanks in addition to latch needles. As one example, he stated that the imported metal shape represented by exhibit 1 was used to make a blank known as a Jacquard Dial C H Spreader, samples of which were introduced in evidence as plaintiff's illustrative exhibit 4. The spreader replaces a needle in certain types of knitting and appears to be a straight rectangular piece of metal with two rounded corners.

The witness next stated that exhibit 1 was also used to make metal blanks known as Jacquard Dial Blanks, No. 75/No. 1814 samples of which were introduced into evidence as plaintiff's illustrative exhibit 5. The witness indicated that these blanks were used to fill up the "slats" in a textile knitting machine. These blanks resemble exhibits 1 and 3 except that their horizontal piece is shorter and one arm of the horizontal is cut in a straight narrow manner lacking the key-like configuration of the importations.

Mr. Bacon testified that exhibit 2 was also used to make blanks of the above type as well as an article known as a Servo-Stop Jack S J 800L, samples of which were introduced in evidence as plaintiff's illustrative exhibit 6. These articles are used to push the latch needles in a knitting machine. When placed with their longest dimension horizontally they resemble a reclining letter P, with an elongated leg and a solid thick portion. The witness testified that exhibit 3 was also used to make the Servo-Stop Jacks.

The witness qualified his statement as to these uses by the admission that a good share of merchandise such as represented by exhibits 1, 2, and 3 would end up as latch needles and that said articles were ordered in a particular shape with some of the varieties of latch needles in mind. For example, the witness stated that the shapes represented by exhibit 1 were ordered with the possibility in mind of using them in three specified brands of knitting machines. The same was true of exhibits 2 and 3.

Mr. Bacon further testified that when large quantities of the blanks or jacks represented by plaintiff's illustrative exhibits 4, 5, and 6 were desired they were made from special stampings and not from metal shapes such as were represented by exhibits 1, 2, and 3.

When manufacturing these blanks and jacks in lesser quantities they used the metal shapes from the inventory which most closely fitted the final product and these were generally of the character of exhibits 1, 2, and 3. The witness also indicated that Laconia Needle Manufacturing Company makes its own metal stampings resembling the importations represented by exhibits 1, 2, and 3.

An exhibit depicting the various steps in the manufacturing of latch needles from the imported shapes was introduced in evidence as plaintiff's illustrative exhibit 7. An explanation of the process of latch needle manufacture was given by Mr. Bacon and was quoted at length in the prior decision in this case.

On the basis of the testimony summarized above, this court concluded that the metal shapes in issue were not, at the time of their importation, dedicated to a single use as latch needles but rather were used in the manufacture of other articles such as blanks and jacks. In light of the evidence, this court considered the facts here to be analogous to those in United States v. National Importing Co. (Inc.) et al., 12 Ct.Cust. Appls. 186 T.D. 40169, in which importations of solid pressed amber resembling in shape pipe bits and cigarette holders were found, on clear and uncontradicted evidence, to be used in both the manufacture of smokers' articles and jewelry. The latter showing precluded a finding that the pressed amber shapes were dedicated to use as smokers' articles and led our appellate tribunal to conclude that the importation was more properly classifiable as unmanufactured amberoid, which by its shaping had not been so advanced as to render it commercially unfit for other uses.

This court also overruled plaintiff's claim for classification of the instant merchandise under paragraph 304 for the reason that adequate testimony was lacking as to whether or not the subject merchandise had been advanced in value or condition subsequent to stamping. Plaintiff's alternative claim for classification under paragraph 397, as articles not specially provided for, in chief value of steel was, however, sustained.

At the rehearing, Mr. Bacon again appeared as a witness for the plaintiff and elaborated on a number of matters contained in his previous testimony. Although he stated that flat parts, i. e., sinkers, jacks and sliders, were regular articles of manufacture by the Laconia Needle Manufacturing Company and that it was possible that the number of such parts manufactured from the imported shapes equalled the number of latch needles, he also testified that exhibits 1, 2, and 3 were each used to produce only one type of flat part and two or three types of latch needles and that the imported shapes were utilized for the making of flat parts 25 to 50 times during a 12-month period.

Defendant introduced in evidence as defendant's exhibit A the Torrington Latch Needle Handbook, published by the Torrington Company, whose numbering system was described by plaintiff's witness as more or less standard in the United States for the ordering of latch needle shapes. The witness stated that the numbers accompanying the silhouetted shapes on pages 70 to 97 of defendant's exhibit A refer to the dimensions of particular latch needles for which the shapes are intended. The witness identified the shapes as basic shapes for use in latch needles and flat parts.

Plaintiff introduced in evidence as plaintiff's exhibit 9, certain pages of the Arrow Flat Parts Catalog published by the Textile Machine Works Company. The witness identified the illustrations on those pages as being completed flat parts, such as various types of jacks and sinkers, and stated that articles shown on pages 54 and 64 were such as had from time to time been made from latch needle blanks such as exhibits 1, 2, and 3. However, the witness stated that Textile Machine Works had a separate catalogue and a separate department for latch needles.

The witness, in testimony related to the above-mentioned catalogues, indicated under cross-examination that in producing flat parts the Laconia Needle Manufacturing Company would order a stamping which was the closest available to the final product and would, therefore, order a shape such as exhibit 2 if the supplier did not have tooling for a more suitable shape. The impression gained from the testimony of the witness is that this procedure is followed when the need for speedy delivery prevents the use of other methods. The witness said that a change was made in the basic shapes of the importations, such as exhibits 1, 2, and 3, when they were cut further to manufacture flat parts in a rush order situation and that such technique was economically feasible. He assumed that a company such as Textile Machine Works would not need to change shapes in this manner and would use shapes cut specifically for articles such as sliders and jacks.

The witness stated under cross-examination that the Laconia Manufacturing Company, would in the case of an order for a small quantity of flat parts (up to five or ten thousand) manufacture its own shapes and that these shapes differed from the imported shapes. The testimony on re-cross-examination concerning this procedure of manufacturing shapes for flat parts was as follows:

Q. Well, where would you ordinarily obtain such shapes?—A. At the time we received the order we would check the material we have in the stock room, available, which would be the stampings. If there was stampings in stock, we would use the stampings, assuming it was a small order.

Q. But I asked you whether you have stampings or shapes specifically made to be used to manufacture jacks and flat parts, and you said "yes," is that correct?—A. Yes.

Q. And I asked where you had obtained them?—A. We produced them.

Q. You produced them?—A. We produced them.

Q. And would these shapes differ from those which are in Plaintiff's Exhibits 1, 2 and 3?—A. In the case of Exhibit 3 the front end would normally be cut, and it is possible that the rear end of this, the back section would be cut.

Q. They would differ in size and shape?—A. Yes.

On re-cross-examination reference was made to those flat parts in plaintiff's exhibit 9 which this witness claimed to have made from imported shapes such as exhibits 1, 2, and 3. The process of making a flat part such as number 5 on page 52 of plaintiff's exhibit 9 (a shape resembling a letter T with an extremely short leg off center and a straight horizontal piece) from exhibit 3 was described as quoted above and concluded as follows:

Q. Now in order to do that would you chop away a good portion of the

shape which had been made to specifications for latch needles?—A. Yes, we would.

Q. And what would you do with the portion which was cut away?—A. Probably throw it away unless we thought we would have another use for it.

Q. Well, what other use could you have for it?—A. Another metal part.

Q. Would you give me an illustration of what you could make from the portion which had been cut away; almost two thirds of plaintiff's exhibit 3?—A. The remaining portion of this, this section here (indicating)— You have a small piece of metal that could be possibly used for another metal part.

Q. Do you remember ever having done that?—A. Not specifically, no.

The second witness for the plaintiff was Mr. Victor Blake, the foreman of the receiving department of Laconia Needle Manufacturing Company who had been in their employ for 33 years. He supervised the removal of articles from the stock room for manufacture. Mr. Blake identified plaintiff's exhibits 1, 2, and 3 as needle stampings. He stated that they were mainly used for making latch needles, and it was not the "practice" to make other articles out of these stampings nor was their use for jacks a general occurrence. He did on occasion use them to make jacks. The witness testified that it was unusual to use exhibits 1, 2, or 3 to make exhibit 6, described previously, but that it had been done. His usual procedure would be to check the inventory of stampings to see if there was anything close to the shape of exhibit 6.

He stated that requests for such stampings were made by a code number which code number referred to dimensions and type of latch needles.

A stamping made by the Laconia Needle Manufacturing Company was introduced in evidence as plaintiff's exhibit 8 and was identified by plaintiff as used in the manufacture of a jacquard needle. The witness was of the opinion that exhibit 8 as well as exhibits 1, 2, and 3 were all stampings unadvanced in any manner and were all subjected to deburring and straightening as the first step in their utilization.

The third witness for the plaintiff was Albert Woidzik, an associate professor in the department of textile technology of Lowell Technological Institute. Professor Woidzik testified that plaintiff's exhibits 1, 2, 3, and 8 were basic stampings made by the punch press method. He gave no testimony regarding the use of these shapes.

Defendant's first witness was John W. Beaber, marketing analyst for the Torrington Company and an employee thereof for 26 years. Mr. Beaber, holding a B.S. in textile engineering, taught knitting at the Philadelphia Textile Institute for 7 years. He stated that the Torrington Company is the largest manufacturer of latch needles in the United States and the second largest in the world.

Mr. Beaber stated that plaintiff's exhibits 1, 2, and 3 were latch needle blanks, designed to specifications for making latch needles and usually used for that purpose in the trade. In his opinion, they were unfinished latch needles and Torrington Company had never used them to make jacks. He testified that plaintiff's exhibits 4, 5, and 6 would be made from flat stock whose specifications would differ from those of the importations. He indicated that it would be too expensive and wasteful to use exhibits 1, 2, and 3 to make exhibits 4, 5, and 6, and he knew of no one who followed such a practice. He stated that plaintiff's exhibit 5 was similar to a latch needle blank but was not a latch needle.

Defendant's second witness was Mr. Edward F. Didier who, prior to his retirement 7 months before the trial, worked 46 years for the Torrington Company as chief cost accountant, plant superintendent, general works manager, and general manager in charge of the sales department. Mr. Didier testified that plaintiff's exhibits 1, 2, and 3 are flat stock latch needle blanks, are de-

signed to be latch needles, and are unfinished latch needles. He stated that their design for latch needles was revealed by the butts, the shape of the milled blade, the shape of the cheek, and the shape of the point. In discussing the feasibility of using exhibits 4, 5, and 6 the witness said:

THE WITNESS: This type, either 1, 2, or 3. It is made from ribbon stock. There is a great deal of waste of material when these blanks are made. The tooling must be very accurate, therefore, very expensive, and the shape of a latch needle is designed into it.

To use this type of blank, except in very, very rare occurrences, would be unthinkable because of the expense.

Q. When you said to use it, you mean for other articles?—A. Yes.

Q. Than latch needles?—A. Yes.

\* \* \* \* \* \*

Q. Are they specifically designed for any type of article?—A. They are specifically designed as flat stock latch needle blanks.

Q. To be manufactured into?— A. Into finished latch needles.

Q. In you opinion, are Plaintiff's Exhibits 1, 2 and 3 unfinished latch needles?—A. Yes.

■ It is established in customs law that an unfinished article is classifiable under the *eo nomine* provision for that article if it is dedicated to use as that article and is advanced to the point where such dedication is apparent. See United States v. Baxter et al., 9 Ct.Cust.Appls. 99, T.D. 37975; Waltham Watch Co. v. United States (Jaeger Watch Co., Inc., Party in Interest), 25 CCPA 330, T.D. 49425; Frank P. Dow Co., Inc. v. United States, 6 Cust.Ct. 384, C.D 500; Norge Division, Borg-Warner Corp. v. United States, 44 Cust.Ct. 121, C.D. 2164.

■ Upon the basis of the record as amplified, it has now been made clear that the importations have been dedicated to use as latch needles and that their use for any other purpose is either fugitive or fragmentary. It has been shown that the peculiar configurations and characteristics of the instant shapes have been designed for the eventual production of finished latch needles. In the specifications and designations by which such importations are ordered and handled in the trade they are identified as latch needles, and, moreover, it has now been brought out that such alternate uses as may have been made of them were not in consonance with their design and were, in fact, in derogation of their dedication and intended use. Consequently, we now reach a conclusion as to dedication which is opposite to that reached in the first decision.

Regarding the design of the imported shapes, we now are of the opinion that the peculiar configuration given to them is an act of dedication. The testimony of defendant's witnesses fully supports this view and the responses of plaintiff's witnesses are not in conflict therewith. The key-like configuration conforms to the shape of the finished latch needle and, as the most specialized refinement of its form, is the clearest indicator of the intent governing its creation. When this knowledge is fortified by an understanding of the nature of the alternative uses claimed by plaintiff, to be discussed, infra, the finding of dedication is unavoidable.

Supplementing the design of the imported shapes was the practice of ordering the importations and routing them within the factory by means of a numerical code which referred to specific dimensions of latch needles. This fact is of some weight in determining the dedication. In Paramount Import Export Co. v. United States, 45 CCPA 82, C.A.D. 677, our appellate tribunal was unswayed by the fact that certain circular disks of shell were ordered by so-called "line" measurements associated with ordering buttons and held that the method of ordering did not establish that the importation was dedicated to use as partly finished shell buttons. There, however, the circularity of the disks did not constitute a refinement of design which

dedicated the importation to a particular use. Here, by contrast, the dedication is by design and our views as to the nature of the design are reinforced by the use of latch needle specifications for ordering and processing. Therefore, the method of ordering and handling reinforces the finding of dedication.

Before turning to the question of the alternative uses claimed by plaintiff, we reiterate our conclusion, based on a close study of the testimony, that such uses were infrequent and that the importations were generally used for latch needles. In fact defendant's witnesses, qualified by many years of experience with the largest manufacturer of latch needles in the United States, knew of no other use and one of plaintiff's own witnesses termed other uses unusual.

 We are aware, of course, that an infrequent alternative use can, nevertheless, destroy a purported dedication. In United States, v. Ford Motor Company, 41 CCPA 22, C.A.D. 831, for instance, the use of the imported spark plugs in approximately 10,000 nonautomotive engines, as opposed to their use in $2\frac{1}{4}$ million automobile engines, was sufficient to prevent their being dedicated to use in automobiles. Here, however, because of the conclusions we reach regarding the nature of the alternative uses their frequency is immaterial.

The nature of the alternative uses of the imported shapes presented by plaintiff, i. e., as jacks, spreaders, and sliders, is the principal area in which the evidence presented at the rehearing has proved enlightening. We are now able to conclude that to the extent that such uses are prevalent they are in negation of the peculiarities of design possessed by the importations.

It is, of course, obvious from the nature of the imported articles and from the evidence of record that to make so-called flat parts from them is a physical possibility. It now appears, however, that in so doing, those very portions of the blanks which are distinctive and sophisticated are destroyed in that process. In this respect, the facts here

are similar to those in a number of prior cases.

In United States v. Baxter et al., supra, certain importations were classified as telephone, trolley, electric light, and telegraph poles. It was the contention of the appellees therein that the importations were entitled to free entry under various provisions for unmanufactured logs. The questions raised in the appellate court were whether the importations were advanced sufficiently to be classified as poles and whether they were dedicated to such use. Both questions were answered in the affirmative. As regards the state of advancement, the court, commenting on the fact that they were at most peeled and knotted with an ax, stated:

> * * * A carpenter can not hang a door until it is fitted to the opening and until there are grooves cut to admit the butts or hinges. Yet it would not do to say that a door is not known to the trade as such and dealt in every day, and that it would not be, if appearing in a tariff act, easily recognizable. An ax helve must be fitted before it is inserted in the ax, but that it is an ax helve, known as such, whenever it meets the eye, is apparent. Where a telephone pole is *installed*, it has added to it cross arms on which wires are strung and become part of the system, but it has reached the state of a telephone pole before that.

As regards the dedication of the involved poles, plaintiff claimed that 20 per centum were used for piling, a use not provided for in the paragraph under which they were classified. To this attack on dedication, the court replied that the testimony indicated that piles and poles possessed different physical characteristics, different specifications, and were distinguished in the trade. In sum, the court stated that the use of telephone poles for piles was a limited one, "resorted to as a convenience when poles which answer the requirements may be found in a shipment of telegraph and telephone poles," and that the peculiar uses to which the imported poles were

adapted were those enumerated in the paragraph within which the classification was made.

In Nyman & Schultz v. United States, 14 Ct.Cust.Appls. 432, T.D. 42060, thin strips of inch-wide steel, in rolls of 10 or 12 pounds, perforated at intervals to fit a Gillette safety razor, were classified as unfinished blades for safety razors. Appellant claimed that the importations were properly classifiable as bands or strips of steel or manufactures of metal and sought to show that they were used for the manufacture of blades other than safety razor blades. The court observed that such alternate uses were infrequent and concluded as follows with regard to the identity and dedication of the importations:

> An examination of the sample before us, and a fair consideration of the testimony in the case, has brought us to the irresistible conclusion that these strips of steel, made as they are to possess the shape, size, and all of the necessary characteristics of unfinished blades for safety razors, are in fact unfinished safety-razor blades, notwithstanding the fact that as unfinished safety-razor blades they are used for other purposes. The fact that unfinished safety-razor blades may be used, as we think they are used for window scrapers, or desk knives, does not make them any less unfinished safety-razor blades. We think they have been dedicated to a single use before reaching this country. The width, thickness, temper, polish, and especially the particular kind of perforations, all dedicated them to the single use as safety-razor blades. True enough the tempering and polishing might fit the steel for the manufacture of pen points, but all of these efforts worked to the same end until, finally, the holes were cut, with such exactitude as to make the three holes in their exact form and position necessary only for fitting the posts of safety razors. To our minds it makes no difference when the perforations were made, if made before importation. This we re-

gard as a dedication to a single purpose regardless of what the article might have been used for, or may be used for after having been so dedicated. A horse blanket with its straps and buckles is no less a horse blanket because it may be used as a covering for human beings.

In Henry Pollack (Inc.) v. United States, 19 CCPA 215, T.D. 45324, our appellate tribunal held that felt bodies which had been wrought into a somewhat conical shape or form were, by reason of their design, dedicated to use in the manufacture of women's hats and were properly classified as partly manufactured articles of wearing apparel. Plaintiff had shown that a substantial quantity of the importation was used in making things other than hats and argued that dedication was thus precluded. The court replied to this line of reasoning as follows:

> We do not think that the issue in this case can be determined by the mere quantity of the merchandise used for making something other than hats, or wearing apparel, but its dedication must rather be determined from the standpoint of what the merchandise was actually designed, manufactured, and shaped for.
>
> If it was, in fact, designed, manufactured and shaped for the purpose of making hats and was dedicated to that use at the time of importation, it is wearing apparel manufactured in part and classifiable under paragraph 1115, and the fact that a considerable number of the shapes so dedicated were diverted from hat making to use as trimmings and artificial flowers (with a small quantity used incidentally for shoes and bags to create an *ensemble* for complying with a temporary fashion, or perhaps in an effort to create a fashion), should not, we think, be held to justify classification outside that dictated by its original and designed purpose.

■ The cited cases support the position that the mere proof of alternate uses

does not suffice to destroy the fact of dedication if such alternate uses are ones which ignore the dedicatory characteristics of the article in issue. It is now clear that the use of the instant importations to manufacture flat parts ignores those aspects of the imported shapes which are specifically designed for latch needles.

We are further supported in this view by the testimony of the witnesses for both the defendant and the plaintiff that the flat parts, for which the importations are purportedly used, are ordinarily made from metal shapes specifically suited for them and differing from the importations in size and shape.

In light of the expanded testimony herein, we are now inclined to the view that the facts in this case have been shown to be dissimilar to those in United States v. National Importing Co. (Inc.) et al., supra. There the alternate use of the pressed amber shapes in jewelry was established by clear and uncontradicted evidence. Such an alternative was shown to be a normal one and one for which the shapes were readily usable. The regularity of this alternate use, when taken in context with the fact that the shaping undergone by the importation was not such as made other uses a violation of some commitment implicit in their design, led to the conclusion that the shapes were not dedicated to use as smokers' articles. Consequently this decision, as opposed to the first decision, cannot be grounded on a finding of nondedication.

Having determined the issue of dedication, we consider the matter of advancement. Plaintiff contends that the importations are not sufficiently advanced to be classifiable within the provision for latch needles and are nothing more than stamped shapes explicitly provided for in paragraph 304 of the Tariff Act of 1930, as modified, supra. At the first trial of this case, plaintiff introduced no evidence regarding the state of advancement of the importations. Accordingly, this court was of the opinion that the testimony was insufficient to support a finding that they were unadvanced stamped shapes. As a result of the rehearing, however, the accumulation of evidence regarding the state of advancement of the importations and the familiarity of plaintiff's witnesses with articles of this nature is sufficient to convince us that they have not been advanced beyond the stage of stamping. Two witnesses for the plaintiff stated that nothing had been done to the stampings prior to importation and the presence of burrs on the edges was a direct result of the action of the stamping die. It was indicated that this, together with their crookedness, was typical of stampings coming from a punch press. In addition, Professor Woidzik testified that plaintiff's exhibits 1, 2, and 3 were basic stampings without any further treatment. As a point of interest we note that plaintiff's witness, Mr. Blake, stated that the only difference between the imported articles and certain unadvanced stampings made in the Laconia Needle Manufacturing Company, which were introduced in evidence as plaintiff's exhibit 8, was that the former were stamped from the edge of the stock. It, therefore, appears that the merchandise at bar has now been shown to consist of unadvanced stamped shapes.

It also appears on the invoice that the value of the importation is greater than the 16 cents per pound minimum provided for in paragraph 304. By dividing the value of the shipment, $1,048.15, by the weight thereof, 236.5 kilograms or approximately 521.5 pounds, we arrive at a value per pound of approximately $2.01. This is well above the statutory minimum.

We are, therefore, faced with an apparent conflict between the provision for latch needles insofar as it holds sway over unfinished latch needles and the provision for stamped shapes. Were this an ordinary problem of resolving the competing claims of two tariff classifications, the rule of relative specificity could be called into play and would ob-

viously result in a preference for the latch needle provision inasmuch as it is patently more specific.

■ However, we must recall that the inclusion of the imported stampings in the provision for latch needles comes about as a result of the application of the principle embodied in the *Waltham* case, supra, that a thing in an unfinished state which is dedicated to use as an article *eo nomine* provided for will be classified under the *eo nomine* provision. Therefore, before we consider the question of relative specificity as between latch needles and stamped shapes, we must face the issue of whether the above stated principle goes so far as to extract unfinished articles from a provision which explicitly provides for them as members of a class of materials in a particular physical state.

We are aware that the above principle has given to various *eo nomine* and parts provisions a preference over provisions for intermediate states of manufacture. See Herman D. Steel Co. and Morris Friedman v. United States, 38 Cust.Ct. 141, C.D. 1855, and cases cited therein. We are of the opinion, however, that there are a number of valid reasons in this case for not applying said principle despite the clear dedication of the importation for use as latch needles.

■■ First and foremost is the distinct nature of paragraph 304. The provision for stamped shapes appears to occupy an undefined middle ground between raw materials and unfinished products. If the stampings are the basic material for manufacturing processes and are not dedicated to any one particular use, there has been no hesitation to place them squarely within paragraph 304. United States v. Frank, 15 Ct.Cust.Appls. 97, T.D. 41284, Summerfield's (Inc.) v. United States, 59 Treas.Dec. 1164, T.D. 44890. Conversely, if the stamping process produces an article, which possesses the character of a finished article, it will be classified under the provision which best suits the finished article. Wm. E. Flory & Co. v.

United States, 45 Treas.Dec. 244, T.D. 40042, Kilian Manufacturing Corporation v. United States, 24 Cust.Ct. 455, Abstract 54322. Moreover, the wording of the statute removes from its ambit, stampings which have been advanced in any manner. Thus the sole difficulty is in dealing with unadvanced stampings which have been dedicated to use as specified articles or parts.

In this connection, a number of cases dealing with articles in an early stage of manufacture are helpful. In United States v. Berger & Co., 13 Ct.Cust.Appls. 362, T.D. 41258, pieces of cylinder glass known as "blanks for bracelet watches" which were dedicated to use as watch crystals were held properly classifiable as manufacturers of glass, not specially provided for, rather than as watch crystals. In American Import Co. v. United States, 26 CCPA 72, T.D. 49612 imported lengths of silk-gut which were used in the making of fishing leaders were, nevertheless, held properly classifiable as manufacturers of silk rather than as leaders or casts, finished or unfinished. In so holding the court stated:

> * * * The mere fact that the instant merchandise is chiefly used, or for that matter exclusively used for leaders (and if it has any other use it is a fugitive one), does not take it out of the "material" class. Hundreds of articles might be suggested which are in the nature of material and which have found but one use. The mere fact that a thing has but one use does not require that it be considered as an article unfinished.

Thus we are supported in our belief that a provision for a basic form of an article need not always yield to the provision for the finished article.

Tending also to support the treatment of the importation as a stamping is our concern that a contrary interpretation would emasculate paragraph 304 inasmuch as it seems obvious that most stampings are intended for a particular use. Similar considerations were before

this court when it held that certain rough iron castings were properly classified as castings under paragraph 327 of the Tariff Act of 1930, as modified by the trade agreement between the United States and Canada, 74 Treas.Dec. 235, T.D. 49752. The Singer Manufacturing Company v. United States, 22 Cust.Ct. 21, C.D. 1152. Although the tariff provision involved therein is different, the observations are pertinent.

　＊　＊　＊　We deem it of no particular significance that the various castings bear indications of their ultimate use for the simple reason that so far as we are informed substantially all castings of iron are fabricated from predetermined patterns which naturally suggest their intended use.

Our analysis of the interplay between the provision for stampings and the provision for latch needles with regard to the instant importations leaves no room for classification in the intermediate stage of paragraph 397 for steel articles not specially provided for as was found in our prior decision in this case. Once the dedicated stamping has been advanced in any manner which removes it from paragraph 304, it will come within the purview of paragraph 343 as latch needles.

In sum, we feel that the distinctions drawn here between the provision for stamped shapes and the various *eo nomine* or parts provisions with which it may tend to conflict as a result of the dedication test for classifying unfinished articles as finished will best preserve the statutory balance and consign to each provision those articles which properly fall thereunder. In light of the above, we sustain the claim of the protest herein to the extent that we hold that the imported articles are properly classifiable as unadvanced stamped steel shapes under paragraph 304 of the Tariff Act of 1930, as modified, supra, and should be assessed with duty at the rate of 12½ per centum ad valorem. All other claims are, however, overruled.

Judgment will be entered accordingly.